Amir Shlesinger (SBN 20413)
ashlesinger@crowell.com
Laura Schwartz (SBN 302907)
lschwartz@crowell.com
CROWELL & MORING LLP
515 South Flower Street, 41st Floor
Los Angeles, CA 90071-1514
Tel: 213.443.5507

Martin J. Bishop (*pro hac vice*)
mbishop@crowell.com
Illinois Bar No. 6269425
Alexandra M. Lucas (*pro hac vice*)
alucas@crowell.com
Illinois Bar No. 6313385
Jason T. Mayer (*pro hac vice*)
jmayer@crowell.com
Illinois Bar No. 6309633
CROWELL & MORING LLP
300 N. LaSalle Drive, Suite 2500
Chicago, IL 60654
Tel: 312.321.4200

Jed Wulfekotte (*pro hac vice*)
jwulfekotte@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: 202.624.2505

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

| | |
|---|---|
| ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, a California corporation; and BLUE CROSS OF CALIFORNIA DBA ANTHEM BLUE CROSS, a California corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> PRIME HEALTHCARE SERVICES – ST. FRANCIS, LLC; CHINO VALLEY MEDICAL CENTER AUXILIARY; PRIME HEALTHCARE SERVICES – ENCINO HOSPITAL, LLC; PRIME HEALTHCARE SERVICES – GARDEN | No.: <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> FRAUDULENT MISREPRESENTATION; NEGLIGENT MISREPRESENTATION; BUSINESS ACTS OR PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.;* VACATUR OF NSA DISPUTE RESOLUTION AWARDS; ERISA CLAIM FOR EQUITABLE RELIEF; DECLARATORY AND INJUNCTIVE RELIEF |

GROVE, LLC; PRIME HEALTHCARE
HUNTINGTON BEACH, LLC; PRIME
HEALTHCARE LA PALMA, LLC;
PRIME HEALTHCARE SERVICES –
MONTCLAIR, LLC; PRIME
HEALTHCARE PARADISE VALLEY,
LLC; PRIME HEALTHCARE
SERVICES - SHASTA, LLC; PRIME
HEALTHCARE SERVICES –
SHERMAN OAKS, LLC; AND PRIME
HEALTHCARE ANAHEIM, LLC;

Defendants.

Plaintiffs Anthem Blue Cross Life and Health Insurance Company ("ABCLH") and Blue Cross of California d/b/a Anthem Blue Cross ("ABC") (collectively, "Anthem") hereby bring suit against Prime Healthcare Services – St. Francis, LLC (d/b/a St. Francis Medical Center); Chino Valley Medical Center Auxiliary (d/b/a Chino Valley Medical Center); Prime Healthcare Services – Encino Hospital, LLC (d/b/a Encino Hospital Medical Center); Prime Healthcare Services – Garden Grove, LLC (d/b/a Garden Grove Hospital and Medical Center); Prime Healthcare Huntington Beach, LLC (d/b/a Huntington Beach Hospital); Prime Healthcare La Palma, LLC (d/b/a La Palma Intercommunity Hospital); Prime Healthcare Services – Montclair, LLC (d/b/a Montclair Hospital Medical Center); Prime Healthcare Paradise Valley, LLC (d/b/a Paradise Valley Hospital); Prime Healthcare Services - Shasta, LLC (d/b/a Shasta Regional Medical Center); Prime Healthcare Services – Sherman Oaks, LLC (d/b/a Sherman Oaks Hospital); and Prime Healthcare Anaheim, LLC (d/b/a West Anaheim Medical Center) (collectively, the "Defendants").

## **INTRODUCTION**

1. Congress enacted the No Suprises Act ("NSA") to protect Americans from abusive health care providers who engaged in the financially devasting practice of sending "surprise bills" for out-of-network services. For patients, the NSA provided significant protection against surprise bills where they are not otherwise protected by

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

state laws. For the Defendants, however, the NSA provided the opportunity to defraud health plans like Anthem.

2.    The NSA created an independent dispute resolution ("IDR") process to resolve certain types of surprise billing disputes between health plans and out-of-network providers. The NSA's IDR process is limited to "qualified IDR items or services" that meet strict eligibility criteria. But beginning no later than January 2024, Defendants have engaged in a scheme to defraud Anthem by knowingly flooding the IDR process with more than 6,000 ineligible disputes and extracting millions of dollars in wrongfully obtained awards. In aggregate, Defendants received more than $15 million greater than what Anthem had originally paid, and the typical award was over six times what a contracted provider would be paid for the same service. Rather than engaging with the IDR process as a forum for resolving good faith payment disputes over "qualified IDR items or services," Defendants use it as an extractive tool to gouge the healthcare system.

3.    This character is in line with Defendants, which are all hospitals owned or controlled by Prime Healthcare Services Inc. ("PHSI") and its affiliate, Prime Healthcare Foundation ("PHF") (together with PHSI, "Prime"). Defendants, and Prime generally, have developed a reputation for prioritizing profits over patients. Many hospitals acquired by Prime have canceled longstanding network contracts to extract higher reimbursement for the same services. Historically, out-of-network Prime hospitals aggressively pursued collection from their patients and routinely filed litigation against health plans like Anthem to recover ever-greater payments. And Prime hospitals who do contract with health plans will publicly threaten to cancel those contracts if they do not receive higher reimbursement rates, putting patients in limbo.

4.    Fortunately, the NSA now protects patients who receive emergency services at Prime hospitals from this financially motivated chicanery. But IDR opened a lucrative revenue stream for Defendants, which were all out-of-network with Anthem for at least some period since the NSA was enacted, and the upside of abusing the

process was too profitable for them to ignore. Nearly every (if not every) time an Anthem member presents at one of the hospitals' emergency departments, Defendants appear to indiscriminately funnel any resulting claims to the IDR process. Defendants even initiate IDR against Anthem regarding *patients that are not Anthem members* and, for Prime hospitals who strategically flipped in and out of Anthem's network, *services governed by in-network contracts*. Defendants appear determined to ramp up this financial strategy—Prime's CFO recently declared that its key growth strategy in 2025 and 2026 is to increase the number of patients treated in Prime's emergency rooms.

5.     In conducting this scheme, Defendants knowingly submit hundreds of IDR disputes every month without conducting sufficient diligence as to whether they are procedurally ripe or substantively eligible for IDR, *even while they must attest to the eligibility of every dispute.* These misrepresentations force payors like Anthem into costly dispute resolution proceedings in cases that the system was designed to weed out. When these disputes proceed to an IDR payment determination—and they often do—Defendants perfunctorily demand 80% of their original billed charges, ignoring any individual circumstances of the episode of care or market realities regarding its value.

6.     Defendants knowingly make false statements at multiple stages throughout the IDR process. In addition to submitting false attestations of eligibility, Defendants falsify key elements as part of the initiation process, such as the type of health plan at issue, negotiation dates, and supporting documentation. This allows them to bypass mandatory regulatory safeguards intended to filter out such ineligible disputes. When Anthem objects to the eligibility of a dispute within the three-day period imposed by the NSA's regulations, Defendants frequently double-down on their misrepresentations of eligibility and successfully push the case forward to the payment determination phase.

7.     Worse, Defendants only send IDR-related communications to Anthem through an unnecessarily restrictive and cumbersome online portal, which in practice

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

makes it impossible for Anthem to effectively respond to Prime's communications and deprives Anthem of the good faith notice to which it is entitled by law.

8.    The fraudulent scheme violated multiple federal and state laws, as set forth herein. Anthem brings this action against Defendants to end Defendants' ongoing fraudulent and abusive conduct and recover resulting damages.

## THE PARTIES

### I.  Plaintiffs

9.    Plaintiff ABC is a health care service plan licensed by the California Department of Managed Health Care and governed by the requirements of the Knox-Keene Health Care Service Plan Act of 1975, Cal. Health & Safety Code §§ 1340 *et seq.* Its principal place of business is in Woodland Hills, California.

10.    Plaintiff ABCLH is an insurance company regulated by the California Department of Insurance. Its principal place of business is in Woodland Hills, California.

### II. Defendants

11.    Prime Healthcare Services – St. Francis, LLC (d/b/a St. Francis Medical Center) ("SFMC") is a PHSI hospital that is incorporated in the State of Delaware with a principal address of 3630 E. Imperial Highway, Lynwood, CA 90262. Per its filings with the California Secretary of State, SFMC's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

12.    Defendant Chino Valley Medical Center Auxiliary (d/b/a Chino Valley Medical Center) ("CVMC") is a PHSI hospital that is incorporated in the State of California with a principal address of 5451 Walnut Avenue, Chino, CA 91710.

13.    Prime Healthcare Services – Encino Hospital, LLC (d/b/a Encino Hospital Medical Center) ("EHMC") is a non-profit PHF hospital that is incorporated in the State of Delaware with a principal address of 16237 Ventura Boulevard, Encino, CA 91436. Per its filings with the California Secretary of State, EHMC's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

14.     Prime Healthcare Services – Garden Grove, LLC (d/b/a Garden Grove Hospital and Medical Center) ("GGHMC") is a PHSI hospital that is incorporated in the State of Delaware with a principal address of 12601 Garden Grove Boulevard, Garden Grove, CA 92843. Per its filings with the California Secretary of State, GGHMC's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

15.     Prime Healthcare Huntington Beach, LLC (d/b/a Huntington Beach Hospital) ("HPH") is a non-profit PHF hospital that is incorporated in the State of Delaware with a principal address of 17772 Beach Boulevard, Huntington Beach, CA 92647. Per its filings with the California Secretary of State, HPH's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

16.     Prime Healthcare La Palma, LLC (d/b/a La Palma Intercommunity Hospital) ("LPIH") is a non-profit PHF hospital that is incorporated in the State of Delaware with a principal address of 7901 Walker Street, La Palma, CA 90623. Per its filings with the California Secretary of State, LPIH's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

17.     Prime Healthcare Services – Montclair, LLC (d/b/a Montclair Hospital Medical Center) ("MHMC") is a non-profit PHSI hospital that is incorporated in the State of Delaware with a principal address of 5000 San Berardino Street, Montclair, CA 91763. Per its filings with the California Secretary of State, MHMC's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

18.     Prime Healthcare Paradise Valley, LLC (d/b/a Paradise Valley Hospital) ("PVH") is a PHSI hospital that is incorporated in the State of Delaware with a principal address of 2400 East Fourth Street, National City, CA 91950. Per its filings with the California Secretary of State, PVH's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

19.     Prime Healthcare Services – Shasta, LLC (d/b/a Shasta Regional Medical

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

Center) ("SRMC") is a PHSI hospital that is incorporated in the State of Delaware with a principal address of 1199 Butte Street, Redding, CA 91761. Per its filings with the California Secretary of State, SDCH's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

20.   Prime Healthcare Services – Sherman Oaks, LLC (d/b/a Sherman Oaks Hospital) ("SOH") is a non-profit PHF hospital that is incorporated in the State of Delaware with a principal address of 4929 Van Nuys Boulevard, Sherman Oaks, CA 91403. Per its filings with the California Secretary of State, SOH's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

21.   Prime Healthcare Anaheim, LLC (d/b/a West Anaheim Medical Center) ("WAMC") is a Prime hospital that is incorporated in the State of Delaware with a principal address of 3033 West Orange Avenue, Anaheim, CA 92804. Per its filings with the California Secretary of State, WAMC's mailing address is 3480 E. Guasti Road, Ontario, CA 91761, the location of Prime's headquarters.

## JURISDICTION AND VENUE

22.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, including the NSA, 42 U.S.C. § 300gg-111, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

23.   Venue is proper in this District under 28 U.S.C. § 1391 because: (i) a substantial part of the events or omissions giving rise to the claims set forth herein occurred in, and were directed toward, this District; (ii) Anthem is headquartered in this District and has suffered injury here; and (iii) one or more of the Defendants reside here.

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

# PARTY BACKGROUND

## I. Anthem Administers Health Care Claims and IDR Proceedings for Members, Plan Sponsors, Government Programs, and BlueCard Plans.

24.    Anthem offers a broad range of health care and related plans, insurance contracts and services to its plan sponsor "members" and insureds who enroll in an Anthem plan, including fully insured and self-funded employee health benefit plans. Anthem processes tens of millions of health care claims annually and is responsible for ensuring that claims are paid accurately and in accordance with plan terms. As a critical part of that responsibility, Anthem is authorized to undertake efforts to safeguard and protect itself, its members and insureds, and the various employer group health plans it administers from fraud, waste, and abuse—like the fraud Defendants are perpetrating here.

25.    Anthem administers claims and benefits for several different types of health care plans relevant to this Amended Complaint.

26.    First, Anthem issues and administers health plans and insurance contracts where Anthem collects premiums and is financially responsible for any benefit payments. Anthem sells these products either directly to consumers or to employers who offer coverage to their employees but do not themselves insure the loss under the plan. These "fully insured" products are typically subject to state regulation, including state laws prohibiting surprise billing and mandating payment for certain out-of-network claims.

27.    Second, Anthem administers self-funded plans, typically offered by large employers to their employees. These employers self-insure the plan and are financially responsible for any payment of benefits or other losses. Because employers often lack infrastructure to provide health insurance to their employees, these plans contract with Anthem for administrative services, such as provider network development, customer service, and claims pricing and adjudication. These plans often delegate authority to Anthem to administer the IDR process on behalf of the plans and discretionary

authority to perform other services incident or necessary to Anthem's administration of the IDR process. The plans typically (though not always) reimburse Anthem for any awards resulting from IDR. They may opt into following certain state insurance laws, such as state surprise billing laws; otherwise, they are subject to ERISA and federal law.

28.    Third, pursuant to the BlueCard program, Anthem acts as a "Host Plan" to other independent Blue Cross and/or Blue Shield "Home Plans" whose members obtain treatment from providers in Anthem's service area in California. As a Host Plan, Anthem manages and participates in IDR proceedings that are initiated by providers in Anthem's California service area for non-Anthem plans whose members received treatment from the initiating California provider.

29.    Providers generally know what type of health care coverage the patient has. Providers require proof of insurance at the point of service to submit claims to the health plan, and the member's health insurance card identifies the nature of the member's coverage. When Anthem issues payment on a claim, the payment is accompanied by an explanation of payment ("EOP"), which includes information about the member's coverage. These EOPs also contain "explanation codes" that explain Anthem's payment decisions and may additionally reference the basis of coverage.

## II. Prime Healthcare

30.    PHSI is a Canadian corporation that controls 51 hospitals across 14 states in the United States.[1] Prime operates 18 of its hospitals through its tax-exempt affiliate, PHF. Though PHF is nominally independent, its President and Board Chair, Kavitha Bhatia, MD, is Prime's Chief Medical Officer of Strategy, and the two legal entities share the same address.[2] Dr. Bhatia is the daughter of Prem Reddy, Prime's Founder,

---

[1] Prime Healthcare, *Facts July 2025*, (2025) https://www.primehealthcare.com/wp-content/uploads/2025/08/Prime-Healthcare_FACTS_07-07-2025.pdf.
[2] *Compare id. with* Prime Healthcare Foundation, *Facts July 2025*, (2025) https://www.primehealthcare.com/wp-content/uploads/2025/08/Prime-Healthcare-Foundation_FACTS_07-07-2025.pdf.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

Chairman, and Chief Executive Officer, and the wife of PHSI's President, Sunny Bhatia, MD.

31.    PHF relies on PHSI to run its hospitals, paying Prime Healthcare Management, another Prime affiliate, for management services.[3] In 2022, such management fees exceeded $58.6 million.[4]

32.    Revenue derived from Emergency Department ("ED") visits is the core of Prime's business model. In 2021, more than 80% of patients who were admitted to PHSI hospitals were originally seen in the ED.[5] That amount rose to 85% in 2023.[6]

33.    PHSI's Chief Financial Officer has explicitly stated that for Prime to grow, "[a] key priority is improving ER volume."[7] The focus on ED means Prime has more "volatile" cash flow "than its for-profit health system peers" because patients seeking emergency care tend to have Medicare or Medicaid insurance, "which reimburse ED care at rates below those paid by commercial health insurers" such as Anthem.[8] In practical terms, this means that Prime's profitability rises and falls on reimbursements from payers like Anthem for treating commercially-insured patients, even though they are a minority of Prime's patient population.

34.    Prime has developed a reputation for its aggressive efforts to extract every dollar it can from the healthcare system. At the extreme end, Prime in 2018 paid $65 million to the Department of Justice ("DOJ") to settle allegations that its California hospitals (including the Defendants) engaged in "up coding"—billing for higher

[3] Fitch Ratings, *Fitch Upgrades Prime Healthcare (CA) to 'A-'; Outlook Stable*, (Apr. 2, 2025), https://www.fitchratings.com/research/us-public-finance/fitch-upgrades-prime-healthcare-ca-to-a-outlook-stable-02-04-2025
[4] Prime Healthcare Foundation, 2022 Form 990, Schedule L, https://apps.irs.gov/pub/epostcard/cor/208065139_202212_990_2024010522186705.pdf.
[5] Fitch Ratings, *Fitch Affirms Prime Healthcare Services at 'B'; Revises Outlook to Negative*; Revises Outlook to Negative, (Oct. 3, 2022), https://www.fitchratings.com/research/corporate-finance/fitch-affirms-prime-healthcare-services-at-b-revises-outlook-to-negative-03-10-2022.
[6] Fitch Ratings, *Fitch Affirms Prime Healthcare's Long-Term IDR at 'B'; Outlook Revised to Stable*, (May 8, 2024), https://www.fitchratings.com/research/corporate-finance/fitch-affirms-prime-healthcare-long-term-idr-at-b-outlook-revised-to-stable-08-05-2024.
[7] Alan Condon, *Hospital turnarounds done right: Prime CFO's 'playbook' for success,* Becker's Hospital Review (Dec. 6, 2024), https://www.primehealthcare.com/transforming-struggling-hospitals-insights-from-steve-aleman-cfo-of-prime-healthcare/.
[8] *Supra*, note 6.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

intensity services than actually provided— in order to justify admitting Medicare patients for more intensive care than necessary.[9] Again in 2021, Prime settled allegations that it paid kickbacks to physicians in exchange for referrals, among other illegal conduct, paying $37.5 million to the DOJ.[10]

35.    Prime's drive to increase its bottom line has led it to frequently engage in maneuvers that threaten its patients. In its earlier years, Prime routinely acquired California hospitals and then canceled network contracts.[11] This inevitably led to Prime balance billing patients when Prime refused to accept patients' insurance payments as payment in full—a practice banned by California state law for emergency services— and California's Department of Managed  Health Care ultimately sued Prime over the practice.[12]

36.    Prime has repeatedly and publicly threatened to terminate contracts with insurers like Anthem unless Prime receives more favorable financial terms, creating significant doubt about the network status of Anthem members' physicians up until the 11th hour of contract negotiations.[13]

37.    Litigating alleged underpayments is a staple of Prime's business model. Over the past decade, Prime has filed dozens of suits in California state court over alleged underpayments, including two suits against Anthem. The lawsuits also revealed Prime's strategy of leveraging out-of-network emergency services into greater payouts at the expense of patients and health plans like Anthem.

[9] Press Release, U.S. Dep't of Just., Prime Healthcare Services and CEO to Pay $65 Million to Settle False Claims Act Allegations, (Aug. 3, 2018), https://www.justice.gov/archives/opa/pr/prime-healthcare-services-and-ceo-pay-65-million-settle-false-claims-act-allegations.

[10] Press Release, U.S. Dep't of Just., Prime Healthcare Services and Two Doctors Agree to Pay $37.5 Million to Settle Allegations of Kickbacks, Billing for a Suspended Doctor, and False Claims for Implantable Medical Hardware, (July 19, 2021), https://www.justice.gov/archives/opa/pr/prime-healthcare-services-and-two-doctors-agree-pay-375-million-settle-allegations-kickbacks.

[11] Fierce Healthcare, *CA sues Prime Healthcare for balance billing insured patients,* (July 7, 2008), https://www.fiercehealthcare.com/finance/ca-sues-prime-healthcare-for-balance-billing-insured-patients.

[12] *Id.*

[13] *E.g.*, David Benda, *Shasta Regional Medical Center terminates contract with Anthem amid contract dispute,* Redding Record Searchlight (Sept. 16, 2021), https://www.redding.com/story/news/local/2021/09/16/shasta-regional-medical-center-terminates-contract-anthem/8363498002/.

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

38.   For example, before the NSA became law, Prime took the position that California law required insurers like Anthem to pay out-of-network providers like Prime *more* than it pays in-network providers under pre-NSA federal law. Courts, however, rejected Prime's arguments forcefully:

> Prime displays its true colors when, as its fallback position, it complains that out-of-network providers should not be limited to [amounts prescribed by 29 C.F.R. § 2590.715-2719A(b)(3)(i)] and, in fact, should be able to receive *more* than in-network providers. But it is *this* outcome that would lead to absurd results because it would disincentivize providers from joining an insurance company's network, would thereby eliminate the stability and certainty arising from having established contractual relationships with settled payment rates, and would result in a multiplicity of lawsuits aimed at settling the reasonable and customary rates.

*Prime Healthcare Centinela, LLC et al. v. United Healthcare Ins. Co.*, No. B334746, 2025 WL 2950428, at *7 (Cal. App. 2d Dist. Oct. 20, 2025) (unpublished) (emphasis original).

39.   The federal statutory minimum payment rates for out-of-network services that Prime complained of to the California Court of Appeals, however, has been replaced by the NSA. Enter Prime's scheme to exploit the NSA in pursuit of Prime's "absurd" goal to be paid more than in-network providers.

## THE NO SURPRISES ACT

### I.  Before the NSA, Out-of-Network Providers Exploited American Consumers with Surprise Medical Bills.

40.   Health plans like Anthem contract with a network of health care providers, including hospitals and physicians, from whom their members may obtain "in-network" care. Such contracts govern the rate for the relevant services and prohibit the providers from billing patients above that amount. Generally, patients receive better and more affordable health care coverage when receiving treatment from in-network providers.

41.   Patients can also choose to obtain treatment from out-of-network

COMPLAINT AND DEMAND FOR JURY TRIAL

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

providers, which have no contract with their health plan. Because out-of-network providers are not bound by contractual billing limitations, patients may pay more when they elect to receive care from out-of-network providers. The health plan will cover a portion of the cost of the services, and the out-of-network provider will "balance bill" the patient for the difference between their "inflated," "non-market-based rates"—known as "billed charges"—and the amounts paid by health plans. H.R. Rep. No. 116-615 (2020), at 53, 57. Patients who choose to seek treatment from an out-of-network provider understand that it will likely be more expense than in-network care; they will likely receive less coverage from their health plan, and in turn, higher bills from their out-of-network provider.

42.    However, there are certain situations in which a patient has no ability to choose between in- and out-of-network care. One example is when a patient suffering from a medical emergency is transported to the nearest emergency room, but the hospital is not in the patient's health plan's network. The problem compounds if the patient needed to be admitted to the hospital from the emergency room, as they could be billed enormous inpatient rates for any ensuing treatment. Before state and federal governments acted, out-of-network providers capitalized on patients' lack of meaningful choice in these circumstances. Some hospitals strategically left insurance networks to reap the benefits of this market inefficiency on the backs of the patients they served.

43.    These out-of-network hospitals widely engaged in the aggressive and financially devastating practice of "surprise billing." Specifically, they would exploit patients' inability to choose an in-network hospital in emergency situations and bill the patient for the difference between their "inflated," "non-market-based" billed charges and the amounts paid by health plans. H.R. Rep. No. 116-615, at 53, 57. Before legislation banned their exploitative practices, surprise billing providers like Defendants held "substantial market power." H.R. Rep. No. 116-615, at 53. They were able to "charge amounts for their services that … result[ed] in compensation far above

what is needed to sustain their practice" because they "face[d] highly inelastic demands for their services because patients lack the ability to meaningfully choose or refuse care." *Id.*

44.    Congress called this framework a "market failure" that was having "devastating financial impacts on Americans and their ability to afford needed health care." *Id.* at 52. In response to such abuses by providers, Congress—as well as many state legislatures like California's—enacted laws to ban surprise medical bills.

## II. The No Surprises Act Created an IDR Process for Qualified IDR Items and Services.

45.    Effective January 1, 2022, the NSA banned surprise billing for three categories of out-of-network care: (1) emergency services, including certain services provided after the patient's emergency condition has stabilized; (2) non-emergency services at in-network facilities; and (3) air ambulance services. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135. To be subject to the NSA and IDR, health care services must fall into one of these three categories and meet other statutory and regulatory requirements described below.

46.    When enacting the NSA, Congress also found "that any surprise billing solution must comprehensively protect consumers by 'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. No. 116-615, at 55. Thus, the NSA created a separate framework for health plans and providers to resolve specific types of eligible surprise billing disputes. *See* 42 U.S.C. § 300gg-111(c). The framework consists of (1) open negotiations—a required 30-business-day period to try resolving the dispute informally; (2) an IDR process for "qualified IDR items and services" if no agreement is reached; and (3) if applicable, a payment determination from private parties called certified IDR entities ("IDREs").

47.    When a health plan receives a claim for out-of-network services subject to the NSA (*i.e.*, emergency services, services provided at an in-network facility, or air ambulance services), the health plan will make an initial payment or issue a notice of

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I). The health plan's EOP is required to, among other things, identify services that are covered by the NSA along with contact a phone number and email address for providers to seek further information or initiate open negotiations. *See generally* 45 C.F.R. § 149.140(d).

48.   If the provider is dissatisfied with the initial payment, then the provider or its designee may initiate open negotiations with the health plan by providing formal written notice to the health plan within 30 business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A). Open negotiation is of central importance to IDR—Congress explained that one of the primary purposes of the NSA was to ensure that health care providers and payors are incentivized to resolve their differences amongst themselves.[14] Providers may only send this notice electronically when two conditions are met: (1) they have a good faith belief that the electronic method is readily accessible by the other party, and (2) the notice is provided in paper form free of charge upon request. 45 C.F.R. § 149.510(b)(1)(ii)(B). After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan over the 30-business-day negotiation period. *See id.*

49.   If the provider initiates and exhausts the 30-day open negotiation period, and "the open negotiations . . . do not result in a determination of an amount of payment for [the] item or service," then the provider may initiate the IDR process. *See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i). Providers must initiate the IDR process within four business days after the open negotiations period has been exhausted. *See id.*

50.   The IDR process is only available for a "qualified IDR item or service" eligible for the process. 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(1), (b)(2). To be considered a qualified IDR item or service, the following conditions must be met:

---

[14] *See* Brady Opening Statement at Full Committee Markup of Health Legislation (Feb. 12, 2020), available at https://waysandmeans.house.gov/2020/02/12/brady-opening-statement-at-full-committee-markup-of-health-legislation-3/.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

a. The underlying services are within the NSA's scope, meaning they are out-of-network emergency services, non-emergency services at participating facilities, or air ambulance services;

b. The services involve a patient with health care coverage through a group plan or health insurer subject to the NSA (*e.g.*, not coverage through government programs like Medicare or Medicaid);

c. A state surprise billing law (referred to as a "specified state law" in the NSA) does not apply to the dispute;

d. The underlying services were covered by the patient's health benefit plan (*i.e.*, payment was not denied);

e. The patient did not waive the NSA's balance billing protections;

f. The provider initiated and exhausted open negotiations pursuant to the NSA's requirements;

g. The provider initiated the IDR process within 4 business days after the open negotiations period was exhausted; and

h. The provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days.

42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

51. When initiating the IDR process, providers must, among other things, submit an attestation that the items and services in dispute are qualified IDR items or services within the scope of the IDR process.[15] A copy of the IDR initiation form, including the attestation, is provided to the non-initiating party, the IDRE, and the Departments.[16] Like with open negotiation notices, written notice of IDR initiation may be made electronically if "[t]he party sending the open negotiation notice has a good

---

[15] *See* 45 C.F.R. § 149.510(b)(2)(iii)(A)(6); *see also* U.S. Dep't of Labor, Notice of IDR Initiation Form, https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

[16] The "Departments" include HHS, the Department of Labor, and the Department of the Treasury.

faith belief that the electronic method is readily accessible by the other party." 45 C.F.R. § 149.510(b)(2)(iii)(B)(1).

## III.   IDR is Not Available for Services Covered by California's Surprise Billing Laws

52.   Congress did not intend the NSA to supplant specified state laws. Congress lauded the fact that at the time the NSA was enacted, more than half of states had already "taken significant steps to address surprise medical bills through consumer protection laws that shield patients from surprise billing in the individual, small group, and fully-insured group markets." H.R. Rep. No. 116-615, at 54. The NSA provides that if the state law already protects the patient from the surprise medical bill and provides a method of determining the out-of-network rate for the services, then the state law applies, and the dispute is not eligible for IDR. 42 U.S.C. § 300gg-111(a)(3)(H)-(K), (c)(1); 49 C.F.R. § 149.510(a)(2)(xi)(A).[17]

53.   The Centers for Medicare & Medicaid Services ("CMS"), the federal agency within the Department of Health and Human Services ("HHS") that is primarily charged with implementing the IDR process, has issued several resources to aid interested parties in determining whether a state surprise billing law exists.[18]

54.   Relevant to Defendants, CMS recognizes that the Knox-Keene Act (California Health and Safety Code § 1371.4 and its implementing regulations—California Code of Regulations Title 28, Sections 1300.71 and 1300.71.39), as applied through case law, is a specified state law that concerns emergency services (referred to herein as the "Knox-Keene Act"). The Knox-Keene Act requires reimbursement for

---

[17] *See also* Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities (Dec. 2023) ("The Federal IDR Process also **does not apply** in instances where a specified state law … provides a method for determining the total OON amount payable under a group health plan or group or individual health insurance coverage.") (emphasis in original), available at https://www.cms.gov/files/document/federal-idr-guidance-idr-entities-march-2023.pdf (last accessed Dec. 22, 2025).

[18] *See, e.g.*, CMS, Consolidated Appropriations Act, 2021 (CAA), https://www.cms.gov/marketplace/about/oversight/other-insurance-protections/consolidated-appropriations-act-2021-caa; CMS, Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process (Jan. 13, 2023), https://www.cms.gov/files/document/caa-federal-idr-applicability-chart.pdf.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

out-of-network emergency services at the reasonable and customary value, based on statistically credible information taking into consideration (i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case. The Knox-Keene Act applies to health care service plans regulated by the Department of Managed Health Care ("DMHC"), including Plaintiff ABC.

**IV.      The IDR Initiation Process Warns Parties of Ineligible Disputes.**

55.    Parties must initiate the IDR process online through a federal "IDR Portal."[19]

56.    The online process for initiating IDR is designed to notify initiating parties of ineligible disputes and prevent initiating parties from inadvertently initiating the IDR process for ineligible items or services.

57.    The first page of the website specifies that parties may "[u]se this form if you participated in an open negotiation period that has expired without agreement for an out-of-network total payment amount for the qualified IDR item or service."

> Review the IDR State list to determine which states will have processes that apply to payment determinations for the items, services, and parties involved. FEHB plans are subject to the Federal IDR process unless OPM contracts with FEHB carriers to include terms that adopt state law as governing for this purpose.
>
> You can start the Federal Independent Dispute Resolution (IDR) process within 4 business days after the end of the 30-business-day open negotiation period if a determination of the total payment for the qualified IDR item(s) or service(s), including cost-sharing, wasn't reached.
>
> You will need to **provide information for both parties involved** in the dispute.

58.    The first page also provides a link to a list of states with specified state laws that render certain disputes ineligible for the IDR process:

---

[19] The website for submissions is https://nsa-idr.cms.gov/paymentdisputes/s/.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

59.    Before initiating the IDR process, parties must agree to certain terms and conditions. The terms and conditions include a notice that the initiating party must submit an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process."

60.    After agreeing to the terms and conditions, initiating parties must answer

> **Before starting:**
>
> You may need to provide information by uploading separate documents. The total file size limit for all uploaded documents is 500MB. Be sure your files meet this limitation.
>
> Along with the general information you'll need to start your Federal IDR dispute process, provide:
> - Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
> - Dates and location of qualified IDR items or services
> - Type of qualified IDR items or services such as emergency services and post-stabilization services
> - Codes for corresponding service and place-of-service
> - Attestation that qualified IDR items or services are within the scope of the Federal IDR process
> - Your preferred certified IDR entity

certain "Qualification Questions" through an online form. If the answers to the Qualification Questions indicate that the dispute is not eligible for IDR, the form will provide an alert and prevent the initiating party from proceeding.

61.    For example, the first page of the Qualification Questions on the federal IDR website requires the initiating party to select a "Health Plan Type." The page makes clear that if the member is enrolled in a Medicare or Medicaid plan, "the dispute is not eligible for the IDR process." Initiating parties cannot select a Medicare or



Medicaid plan option and proceed with the initiation process.

62.    As another example, the Qualification Questions on the federal IDR website asks when the party began the open negotiation process.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

63.  Parties must exhaust a 30-business-day open negotiation period before either party may initiate the federal IDR process. If the initiating party enters a date that is not at least 31 days before the date of website submission, the federal IDR website will not permit the initiating party to proceed and seek payment for the service.



64.  Further, if the IDR initiation is not within four business days of the end of the 30-day open negotiation period, the initiating party must provide a reason why they are eligible for an extension and provide supporting documentation.

65.  After successfully completing the Qualification Questions, the initiating party is asked to complete the Notice of IDR Initiation Form. The initiating party must provide a variety of relevant information, including the name and contact information of the health care provider, the claim number, the date of the service, the qualifying payment amount ("QPA")—generally the plan's median in-network rate for the same

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

service in the same geographic area—for the qualified IDR item or services at issue, and documentation supporting these facts.

66.    At the end of this process, the submitting party must attest, via electronic signature, that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process."



67.    A copy of the Notice of IDR Initiation—including the initiating party's attestation that that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process"—is provided to the non-initiating party (*i.e.*, the health plan), the IDRE, and the Departments.

68.    As illustrated above, at every stage of this online process, the initiating party must make false statements to submit a dispute for services that are not eligible for IDR, or the initiation process cannot continue. As such, when a party initiates the IDR process, it has full knowledge of the requirements and limits of the IDR process.

**V. Anthem Informs Providers of Ineligible Disputes, including those Subject to California's Surprise Billing Laws.**

69.    In addition to the Qualification Questions and IDR initiation process, Anthem sends multiple communications informing providers when services are ineligible for the IDR process.

70.   First, Anthem identifies in EOPs whether the services are subject to DMHC regulation, including application of the Knox-Keene Act. When this "DMHC" indication is present, providers know that any dispute regarding payment cannot be

| CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|
| | PATIENT NAME: | | | FOR INQUIRIES CALL: | |
| | RECEIVED DATE: | | 03/18/2024 | (855) 854-1438 | |
| | EXPL CD: | | APPEALS CODE: DMHC | | |
| PLAN TYPE: PPO | DRG RCVD: N/A | | | | |
| 4,663.47- | 0.00 | | 7,502.18- | 015 45    038 1 | 2,907.35- |
| 4,663.47- | 0.00 | | 7,502.18- | | 2,907.35- |
| | | | | | 0.00 |
| | | | | | 2,907.35- |

submitted to IDR.

71.   Conversely, when a claim includes qualified items and services that may be eligible for IDR, Anthem clearly informs providers through a remark code. The absence of this remark code is further indication of ineligibility for IDR.

72.   Anthem continues to inform providers of ineligibility after the EOP. When providers initiate open negotiations for items and services that are not qualified for IDR, Anthem's sends a written response that clearly notifies them of this fact.

| AUQ | This claim was paid according to the Federal No Surprises Act. The member is only responsible for their in-network copay, percentage of the cost (co-insurance), and deductible. You cannot bill the member for more. If you disagree with our decision, you can initiate the 30-day open negotiation period through Availity.com. Log onto Availity.com and select the Claims & Payments tab. Use the Claims Status application to find your claim. Select the Dispute button to attach additional supporting documentation and press Submit Attachments. If the dispute button is not available, use the Chat with Payer button on Availity.com. |
|---|---|

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

> The Independent Dispute Resolution (IDR) team with Anthem received a request for negotiation on 12/21/2024 , regarding the below referenced claim(s). Unfortunately, we are unable to process your request for negotiation due to the following marked reasons:
>
> ☐ Provider did not send in the negotiation claim payment dispute timely per federal mandated guidelines.
>
> ☐ Provider has a Single Case Agreement (SCA) or Letter of Agreement (LOA) on file for the service requesting negotiation. The claim has been priced and paid pursuant to that negotiated rate per our vendor.
>
> ☐ State Surprise Billing Law applies to this claim, please file through the appropriate state process.
>
> ☐ This request was not submitted to the correct plan. Please submit your federal No Surprises Act open negotiation request to the local plan in the state where services were rendered.
>
> ☐ Services are not covered under the Member's plan or there is no Evidence of Coverage (EOC).The Provider had obtained consent to balance bill the member.
>
> ☑ Claim is not governed by the Federal No Surprises Act.

If the provider continues disregarding Anthem's communications and initiates IDR, Anthem once again informs them of ineligibility. For example, when the Knox-Keene Act applies, Anthem notifies the provider that the items or services are "ineligible for IDR under the NSA because a state surprise billing law applies."

> The Independent Dispute Resolution (IDR) Team has received an IDR initiation notice for the above DISP Number. After review, the claim(s) is/are out of the scope (OOS) of the Federal No Surprises Act (NSA), due to the following reason(s). Please refer to the addendum for more information.
>
> ☑ The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies. Per CMS guidelines, where a specified state law provides a method for determining the total amount payable for out-of-network items and services, providers may not engage in the federal IDR process for resolving payment disputes under the NSA.

| Claim # | Service Start Date | Service End Date | Location of Services (provider state location) | Location of Member Plan (member state location) | Member Health Plan Type | Applicable State Law | Out of Scope Reason |
|---|---|---|---|---|---|---|---|
| 2023361EE7313 | 12/20/2023 | 12/20/2023 | CA | CA | Fully Insured | CA | State Surprise Bill applies, |

73.    Like the Qualification Questions and IDR initiation process, Anthem's communications of ineligibility in the EOP, during open negotiations, and after IDR

initiation ensure that providers do not mistakenly pursue the IDR process for non-qualified items or services that are outside the scope of the process.

**VI.    IDREs Make Payment Determinations Subject to Judicial Review in Certain Specified Circumstances.**

74.    After the provider initiates the IDR process, the parties select, or HHS appoints, an IDRE. 42 U.S.C. § 300gg-111(c)(4)(F). The IDRE performs two tasks.

75.    *First*, the IDRE is directed by regulation (though not by the Act itself) to "determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). In making this determination that the IDR process applies, the IDRE is directed to "review the information submitted in the notice of IDR initiation" with the provider's attestation of eligibility. 45 C.F.R. § 149.510(c)(1)(v). In practice, this is a cursory review by the IDRE based on incomplete, one-sided information. The layers of safeguards in the IDR initiation process—including the Qualification Questions and provider attestations—are intended to prevent parties from initiating the IDR process with ineligible disputes at the outset, before the dispute reaches the IDRE. Once a dispute reaches the IDRE, the initiating party has already bypassed those safeguards and affirmatively attested to the eligibility of the dispute, and the IDRE reviews the notice of IDR initiation with the affirmative attestation to determine eligibility. *See id.*

76.    *Second*, if the IDRE determines the IDR process applies, then the IDRE proceeds to a payment determination. 42 U.S.C. § 300gg-111(c)(5)(A). The IDRE's payment determination must involve "a qualified IDR item or service." *Id.*

77.    IDR payment determinations resemble a baseball-style dispute resolution where the provider and health plan each submit an offer, and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B). The process, wherein the IDRE has no authority to modify the parties' bids, is premised on the notion that ineligible claims will be weeded out at the outset.

78.    In making its payment determination, the IDRE must consider the QPA—which approximates the health plan's median in-network contracting rate for the

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

services—and several "additional circumstances," such as training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). IDREs cannot consider, among other things, the provider's charges. 42 U.S.C. § 300gg-111(c)(5)(D) (IDREs "shall not consider … the amount that would have been billed by such provider or facility …"). Congress reasoned that permitting IDREs to "consider non-market-based rates such as the providers' billed charges … may drive up consumer costs." H.R. Rep. No. 116-615, at 57.

79.    The NSA states that an IDR payment determination for a "qualified IDR item or service" is "binding" unless there was "a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim[.]" 42 U.S.C. § 300gg-111(c)(5)(E)(i).

80.    Parties to IDR proceedings are responsible for payment of two fees. First, both parties must pay a non-refundable administrative fee—currently $115—when the dispute is initiated. This fee is not recoverable even when the IDRE determines that the dispute does not qualify for IDR, or even when the initiating party later voluntarily withdraws the dispute. Second, both parties must pay an IDRE fee before the IDRE makes the payment determination. The IDRE fee is set by the specific IDRE and depends the type of IDR submitted, but ranges from $200 to $1,173. The party whose offer is selected by the IDRE is refunded its IDRE fee, meaning it is only responsible for the $115 administrative fee. The non-prevailing party is generally responsible for both the administrative fee and the IDRE fee.

81.    Notably, IDREs are only compensated when a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F). They do not receive compensation when dismissing a dispute due to the ineligibility of the service. *See id.* And because IDREs are compensated on a per-dispute basis, they receive greater compensation when there are a greater total number of disputes.

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

## VII.    The NSA's IDR Process Skews Heavily in Favor of Providers.

82.    Overall, the NSA's IDR process has been overwhelmed by a staggering volume of disputes that far exceeds the government's initial estimates.

83.    Before the IDR process was launched, CMS estimated that parties would initiate about 22,000 IDR process disputes in the first year. Yet providers have shattered this projection. The most recent government statistics show that from January 1 to November 30, 2025, disputing parties—virtually all of whom are providers— initiated 2,291,586 disputes, more than 55 percent more disputes than were filed in all of 2024.[20] This figure from 11 months is more than 100 times the volume of disputes that the government originally anticipated over a full year.

84.    Overutilization of the IDR process is contributing to billions of dollars in additional costs for the U.S. healthcare system. From 2022 to 2024, the IDR process caused at least $5 billion in total costs.[21] Of the $5 billion, $2.24 billion in costs arose from payment determinations in favor of the provider.[22] Administrative and IDR entity fees total $884 million.[23] "[T]he high costs will add to overall health system costs and will ultimately be paid by consumers."[24]

85.    Government data also shows that the IDR process has not led to fair or balanced outcomes with objectively reasonable payment determinations. Instead, the IDR process heavily favors providers. In the most recent reporting period, providers prevailed in 85 percent of IDR payment determinations.[25]

86.    Moreover, providers are not prevailing with objectively reasonable payment offers. Congress directed IDR payment determinations to be made according

---

[20] CMS, Independent Dispute Resolution Reports, (2025) https://www.cms.gov/nosurprises/policies-and-resources/reports.

[21] Jack Hoadley et al., *The Substantial Costs of the No Surprises Act Arbitration Process*, Health Affairs, (Aug. 25, 2025), https://www.healthaffairs.org/content/forefront/substantial-costs-no-surprises-act-arbitration-process.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] CMS, Supplemental Background on the Federal IDR Public Use Files, July 1, 2024—Dec. 31, 2024, *supra*.

to the QPA and several "additional circumstances," such as the training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). In practice, however, IDRE payment determinations far exceed the QPA.

87.    During the most recent reporting period in the second half of 2024, prevailing offers exceeded the QPA 85 percent of the time. *See id.* For line items in which the provider prevailed, the median payment determination was 459 percent of the QPA.[26] "[T]he rationale behind payment determinations remains unclear due to limited transparency into how IDR entities evaluate submissions."[27]

88.    In short, providers like Defendants are winning the majority of IDRs they file, and generally recovering more than 4.5 times what a contracted provider receives for the same service. This unfortunate trend is unsurprising, given that providers initiate virtually all IDR disputes and IDREs earn their fees on a per-dispute basis.

89.    Recognizing these dynamics, Defendants launched their fraudulent NSA Schemes to enrich themselves at the expense of Anthem.

**DEFENDANTS' FRAUDULENT NSA SCHEME**

90.    Beginning no later than January 2024, Defendants launched their scheme to defraud Anthem by initiating thousands of knowingly ineligible IDR proceedings against Anthem. To effectuate their scheme, Defendants made false statements, representations, and attestations regarding eligibility for IDR under the NSA.

91.    The Defendants are all hospitals under Prime's control, either directly or indirectly through Prime's management agreements with the Prime Healthcare Foundation.

92.    The core of the Defendants' scheme relies on Defendants' calculated bet: that through repeated and knowing misrepresentations that the submitted disputes met

---

[26] *See* CMS, *Independent Dispute Resolution Reports, Federal IDR PUF for 2024 Q4,* (May 28, 2025), https://www.cms.gov/nosurprises/policies-and-resources/reports.
[27] Kennet Watts et al., *No Surprises Act Arbitrators Vary Significantly in Their Decision Making Patterns*, Health Affairs, (June 24, 2025) https://www.healthaffairs.org/content/forefront/no-surprises-act-arbitrators-vary-significantly-their-decision-making-patterns.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

the criteria for the federal IDR process, they could flood the IDR process and procure payments on knowingly ineligible disputes. And they did. Anthem's data shows that more than 75% of the disputes submitted by the Defendants were categorically ineligible for the IDR process. As a result of these ineligible disputes, since January 2024, Anthem's records show that Defendants have fraudulently secured more than $15 million in improper IDR awards from Anthem, while costing Anthem more than $2 million in IDR-related fees and significant operational costs to merely handle this number of disputes.

93.    As alleged herein, IDR is only available for specific categories of disputes, subject to strict statutory and regulatory criteria. However, Defendants knowingly submit false attestations through the IDR portal, claiming eligibility for disputes involving: (1) services subject to the Knox-Keene Act; (2) services not covered by the patient's plan; (3) disputes for which Defendants failed to initiate or pursue open negotiations; (4) disputes already resolved or barred by timing rules; (5) disputes for services pre-dating the NSA; and (6) services that were governed by a contract with Anthem.

94.    Defendants' scheme involves the knowing submission of hundreds of ineligible IDR disputes *per month* without conducting the due diligence to determine eligibility or even heeding Anthem's express written communications. IDREs on average dismiss about 18% of disputes due to ineligibility,[28] yet nearly half of all disputes initiated by Defendants against Anthem were dismissed or deemed by the IDRE as ineligible. This volume is intended to overwhelm Anthem and the IDREs, causing thousands of ineligible disputes to reach a payment decision.

95.    Defendants compound their oppressive volume of IDR disputes with an absurdly cumbersome communications portal through which Defendants send all communications related to open negotiation or IDR (the "Prime Portal"). When Defendants attempt to communicate with Anthem, the Prime Portal generates generic

---

[28] *Supra*, Note 19.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

cover emails containing little more than a link that takes Anthem to the Prime Portal where the actual message exists. All communications are funneled to a single email address at Anthem manned by dozens of employees, but the Prime Portal's restrictions mean that only a single Anthem employee can access messages in the Prime Portal at any given time. Further, these messages automatically delete after only 30 days; unless Anthem affirmatively saves each of the thousands of messages Prime sends, they become inaccessible. These barriers obstruct Anthem's ability to manage Defendants' immense IDR volume and substantially increase Anthem's operational costs and expenses.

## I. Defendants Knowingly Make False Statements, Representations, and Attestations of Eligibility to Initiate the IDR Process.

96.    Defendants' goals are to interfere with Anthem's and the IDR process infrastructure's ability to effectively identify ineligible disputes and to overwhelm the IDR system and the IDREs that make cursory eligibility and payment determinations.

97.    Through considerable operational burden and expense, Anthem has worked since the inception of the IDR process to craft workflows allowing it to identify most of the unqualified items or services and notify Defendants that the disputes do not quality for IDR. Yet despite Anthem's objections and best efforts, many of Defendants' ineligible disputes reach a payment determination due to Defendants' knowingly false attestations of eligibility.

98.    When flooding the IDR process with ineligible disputes against Anthem, Defendants make repeated false attestations and representations that the items or services in dispute are "qualified item(s) and/or service(s) within the scope of the Federal IDR process" when, in fact, Defendants know they are not. 45 C.F.R. § 149.510(b)(2)(iii)(A)(6).[29] Defendants make these false attestations and representations to Anthem, the IDRE, and the Departments.

---

[29] *See also* U.S. Dep't of Labor Notice of IDR Initiation Form, https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

99.   The items and services that Defendants falsely attest are "qualified item(s) and service(s) within the scope of the Federal IDR process" are patently ineligible, and Defendants know that they are ineligible when making their false attestations.

100.   As noted above, the online process for initiating IDR is designed to—and does—notify Defendants of the kinds of disputes that are ineligible to prevent them from submitting ineligible items or services. In order to push their ineligible services through the IDR process, Defendants must affirmatively make false statements; if they do not, the system prevents them from proceeding with their ineligible dispute. Of course, the IDR Portal cannot tell when the provider misrepresents information about the relevant plan, service, or dispute because it relies on truthful and accurate submissions by the initiating party. Defendants take advantage of this vulnerability in the system to carry out the NSA Scheme.

101.   In addition, when Defendants manage to push through ineligible claims by submitting false statements to the federal IDR portal, Anthem often directly notifies Defendants that the dispute violates the NSA's eligibility requirements. Yet, despite receiving this information, Defendants routinely proceed with their IDR disputes anyway—demonstrating not only their knowledge of the fraud, but their intentional and ongoing participation in it.

102.   For example, Defendants know when services are subject to the Knox-Keene Act and therefore ineligible for the IDR process. Defendants have an independent obligation to determine whether a service is eligible for IDR, and they may review the patient's health insurance ID card and/or contact Anthem to determine whether the plan is subject to state law and DMHC regulation. When issuing payment, Anthem's EOP expressly states that the member's plan and any appeals are subject to state law and DMHC regulation. When Defendants initiate open negotiations and IDR for services subject to the Knox-Keene Act, Anthem informs Defendants that the dispute is not governed by the NSA. And to prevent parties from inadvertently initiating the IDR process for services subject to a specified state law like the Knox-

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

Keene Act, the first page of the IDR initiation form also (1) provides a link to information listing states—like California—that have surprise billing laws that may render the NSA inapplicable, and (2) informs initiating parties that they must submit an attestation that the services at issue are qualified IDR items or services within the scope of the Federal IDR process. Before initiating the IDR process, Defendants must affirmatively attest that the services are "qualified item(s) and/or services(s) within the scope of the Federal IDR process." Defendants submit these fraudulent attestations for disputes subject to the Knox-Keene Act with full knowledge of their falsity.

103.  As another example, Defendants also know when they initiate disputes for services where no open negotiation occurred. As part of the IDR initiation process, initiating parties must identify, among other things, the specific date that they initiated open negotiations and documentation supporting the open negotiations process. They then affirmatively attest that the "item(s) and service(s) at issue are qualified items and/or service(s) within the scope of the Federal IDR process." Defendants must falsely complete these fields and attestation in order to access IDR when they failed to negotiate. Anthem even notifies Defendants in writing when they initiate IDR after failing to complete the open negotiation period. But Defendants pursue these disputes in IDR despite their knowledge that they are ineligible.

104.  More fundamentally, one of the Defendants (SRMC) even initiated IDR regarding services provided while it was in-network with Anthem from January 1, 2023, to December 31, 2023. By the very terms of the statute, the NSA has no relevance to payment disputes over services subject to contracts between providers and payers. These in-network disputes were not only ineligible for IDR, but also subject to binding dispute resolution provisions in SRMC's contract with Anthem.[30] While Anthem is not pursuing relief as to these in-network disputes in this Complaint, they are further

---

[30] Three other Prime facilities— Prime Healthcare Centinela, LLC (d/b/a Centinela Hospital Medical Center), Prime Healthcare Services – San Dimas, LLC (d/b/a San Dimas Community Hospital), and Desert Valley Hospital, LLC—similarly initiated IDR with respect to in-network healthcare services. Because Anthem's claims against these facilities are subject to binding dispute resolution provisions, they are not included as defendants in this action.

evidence of Defendants' widespread misuse of IDR.

105. Such ineligible disputes cannot proceed through the IDR Portal by mere inadvertence or neglect on the part of Defendants. Instead, Defendants knowingly make false statements and representations to bypass the system's safeguards. Each and every one of Defendants' electronic submissions to the Departments and the IDRE for these ineligible disputes constitutes a knowingly false statement; Defendants had to input misrepresentations about the type of plan, service, or nature of the dispute and falsely attest that the "item(s) and service(s) at issue are qualified items and/or service(s) within the scope of the Federal IDR process" to overcome the IDR system's safeguards and get their disputes submitted.

106. According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including Defendants' false attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). When receiving an avalanche of ineligible disputes from Defendants all at once, IDREs rely on Defendants' false attestations of eligibility to reach and issue a payment determination on ineligible disputes. And IDREs have no incentive to dismiss disputes due to ineligibility because they only receive compensation if a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F). Defendants exploit this incentive structure to carry out their fraudulent scheme.

107. Since at least 2024, the majority of disputes initiated by Defendants that reached a payment determination were ineligible for the IDR process, often over Anthem's objections. From these fraudulent submissions alone, Defendants have received millions of dollars in improper IDR award payments.

**II. Defendants Intentionally Initiate Open Negotiations and IDR Disputes in a Manner Designed to Prevent Anthem from Meaningfully Engaging in the Process.**

108. Notice to opposing parties is an essential component of the NSA. The

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

failure to properly notify an opposing party of open negotiations or an IDR dispute is a procedural defect that renders the dispute ineligible for IDR. If a payor does not receive appropriate notice of IDR initiation, it may be deprived of the opportunity to meet the NSA's strict timelines for selecting an IDRE, submitting an objection, and submitting a payment offer, which can lead to a default determination in favor of the provider.

109.  Both open negotiation notices and notices of IDR initiations may only be provided electronically when the party sending the notice "has a good faith belief that the electronic method is readily accessible by the other party." 45 C.F.R. § 149.510(b)(1)(ii)(B)(1), (b)(2)(iii)(B)(1).

110.  Defendants do not satisfy these notice requirements. Instead, they provide these statutorily required notices, as well as other IDR-related communications, through the Prime Portal, which is a cloud-based messaging portal hosted at primehealthcare.login-us.mimecast.com. This electronic means of providing the notice is *not* readily accessible by Anthem, and there could be no reasonable belief that it is.

111.  The Prime Portal is operated by employees of PrimEra Medical Technologies ("PMT"), a medical billing company based in Hyderabad, India, that on information and belief is controlled by relatives of Prime's founder, Dr. Prem Reddy.[31] PMT submits notices of open negotiation and IDR disputes on behalf of all Defendants.

112.  Each of Defendants' IDR-related messages is created through the Prime Portal as a "secure message." A cover email originating from addresses such as idrappeals@primehealthcare.com or nsasuportteam@primehealthcare.com is then sent to the health plan; Anthem's dedicated email address for Open Negotiations and IDR disputes, FederalIDR@anthem.com. The cover email indicates that there is a secure

---

[31] Some sources list Dr. Prem Reddy as PMT's Chief Executive Officer. *See* Fintech Magazine, Prime Healthcare, (last accessed Dec. 30, 2025), https://fintechmagazine.com/company/prime-healthcare-10.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

message available to view and accessible via a link in the body of the email.



113.  These emails contain none of the information required for proper notice under the NSA. They do not mention the items or services at issue, the codes billed, payment history on the relevant claim, or an offer for payment. Nor do they contain the mandatory notice form developed by the applicable government agency. *See generally* 45 C.F.R. § 149.510(b).

114.  When any employee on Anthem's large, IDR-dedicated team clicks on the links in these emails, they are brought to a login page that is only accessible by entering the email address that received a message from the Prime Portal.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia



115.  Only after completing this step can Anthem access the Prime Portal and Defendants' "notices" of Open Negotiation and IDR initiation.



116.  In addition to failing to provide sufficient notice under the NSA with its cover emails, the Prime Portal is configured such that only one Anthem employee can access it at one time because the only username available to Anthem is the single email address that receives the messages. If a second Anthem employee logs in to the Prime Portal, the first is kicked out. Given the volume of notices Defendants send through the Prime Portal, this often results in the Prime Portal crashing or timing out, making it all but impossible for Anthem to effectively work within it.

117.  The Prime Portal's failings are compounded by the fact that each message

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

is set to automatically delete after 30 days. In the context of open negotiations, a 30-day message expiration is at odds with the statutory negotiation period of 30 *business days*. *See* 45 C.F.R. § 149.510(b)(ii)(B). In this way, the Prime Portal as designed deprives Anthem of the ability to access information needed to respond to a notice of open negotiation, even while the negotiation period is still open.

118.  Defendants' use of the Prime Portal to initiate open negotiation and IDR disputes is not a good faith effort to comply with the notice requirements of the NSA. Prime could have no good faith belief that this method of electronic communication is reasonably accessible to Anthem. The Prime Portal's design flaws coupled with the volume of disputes initiated by Defendants (who are not the only providers submitting disputes to Anthem) make it all but impossible for Anthem's employees to access each alleged notice, and has resulted in Anthem paying improper default IDR awards.

## DEFENDANTS' NSA SCHEME DAMAGES ANTHEM AND CONSUMERS

119.  As a result of Defendants' unlawful conduct, Anthem has paid excessive amounts for medical services and incurred unnecessary administrative and dispute resolution fees. The financial harm caused by Defendants' abusive practices is ongoing and threatens the affordability and sustainability of health benefits for Anthem's members.

120.  Since January 4, 2024, Anthem's records show that Defendants initiated more than 9,000 IDR proceedings, consisting of more than 8,000 distinct claims and 89,000 separate services, against Anthem. However, the earliest publicly available data published by CMS shows that the Defendants were parties to IDR determinations against Anthem in 2023, so the scheme likely began then or before.

121.  Anthem determined that more than 75 percent of these disputes were ineligible for IDR for reasons like the services were categorically ineligible for IDR, such as Medicaid claims, or for which Defendants failed to initiate mandatory open negotiations. For these ineligible disputes catalogued in Anthem's data, Defendants illicitly secured millions of dollars in improper IDR awards.

122. Defendants made false and fraudulent statements, representations, and attestations related to the following illustrative fraudulent IDR disputes, including, but not limited to, the following:

## I. St. Francis Medical Center

### 1. *DISP-1177747*

123. The IDR proceeding captioned DISP-1177747 involved emergency department services rendered at SFMC on December 15–16, 2023, to a member of a fully insured health plan administered by ABC. SFMC billed $3,999.77 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for services.

124. On or about January 2, 2024, ABC issued payment of $1,609.29, which was the appropriate amount required by the Knox-Keene Act. The EOP was sent to SFMC at 3630 E. Imperial Hwy, Lynwood, CA 90262. The explanation code referenced in the claim payment does not reference NSA eligibility. The same EOP included payment information for other claims submitted by SFMC that *were* eligible for NSA dispute resolution, as indicated by specific explanation codes. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

125. On February 7, 2024, SFMC sent a notice of open negotiation to FederalIDR@anthem.com (the "Anthem IDR Email Address") using the email address NSASupportTeam@primehealthcare.com, where SFMC represented that it would settle the already paid claim for $3,199.82 (80% of the billed charges). The notice of Open Negotiation was signed by Chandana Shavagoni, who on information and belief was a PMT employee, using the NSASupportTeam@primehealthcare.com email address.

126. On February 19, 2024, Anthem responded to the notice of open negotiation, via the Anthem IDR Email Address, and indicated that "[a]fter a careful and thorough review, it has been determined that the claim submitted does not meet the

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

Federal No Surprises Act Guidelines." This response further pointed to specific indicators—"corresponding EOB codes: AUU, AUQ, AUS, and AUW"—in the mailed remittance that show the claim was not eligible for submission under the NSA. SFMC never responded to Anthem's notification of ineligibility.

127. Despite clear ineligibility due to the application of the Knox-Keene Act, on or about March 21, 2024, SFMC initiated IDR and falsely attested that the dispute concerned a qualified item or service within the scope of the federal IDR process.

128. At its first opportunity, Anthem objected to the eligibility of the underlying claim. First, on March 25, 2024, when Anthem submitted its first responsive form—an IDR Entity Selection Response Form—Anthem attested that the claim was ineligible, because "[t]he dispute includes items or services not covered under the No Surprises Act." And on November 11, 2024, in response to a request, Anthem emailed further documentary proof to the IDRE that the claim was subject to a state surprise billing process.

129. On December 7, 2024, Anthem objected to the IDRE again via written letter. Anthem's second objection was also addressed to SFMC at 3630 E. Imperial Hwy., Lynwood, CA 90262-2609, and stated that "[t]his dispute includes items or services under a coverage type not subject to the NSA." SFMC again did not respond to Anthem's notice of ineligibility, nor did it withdraw the dispute.

130. Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate rate under the Knox-Keene Act, the IDRE nevertheless proceeded to a final payment determination and ordered ABC to pay a different amount. Because of SFMC's fraudulent attestations, ABC paid $2,874.82—*approximately $1,000 more than the payment required by the Knox-Keene Act*. Anthem also paid $765 in unnecessary IDR-related fees.

### 2. *DISP-706993*

131. The IDR proceeding captioned DISP-706993 involved emergency department services rendered at SFMC to a member of a Medicaid managed care plan

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

administered by Anthem on June 18, 2023. SFMC billed $2,076.44 for the services.

132. On or about July 7, 2023, Anthem issued payment of $70.37—the Medicaid rate applicable to the services. The EOP, sent to SFMC at 3630 E Imperial Hwy, Lynwood, CA 90262 reflected that the member's plan was a Managed Medicaid plan and that SFMC was an in-network provider with respect to these services.



133. On August 31, 2023, SFMC sent a notice of open negotiation to Anthem using the email address NSASupportTeam@primehealthcare.com, requesting an additional payment amount of $1,661.15 (80% of the billed charges) to settle their purported dispute. The notice listed Aehsan Sheikh, a PMT employee, as the SFMC point of contact for negotiation.

134. On September 13, 2023, Anthem responded to SFMC's open negotiation request via email and indicated that the services were not covered by the NSA and therefore ineligible for IDR. Anthem directed SFMC to review the mailed EOP for further information on ineligibility. SFMC never responded to Anthem's notification of ineligibility.

135. Despite clear ineligibility due to the member's plan being a managed Medicaid plan, SFMC initiated IDR and falsely attested that the dispute involved a qualified item or service within the scope of the federal IDR process.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

136.   On September 25, 2024, Anthem submitted an objection to eligibility to the IDRE, which was also addressed to SFMC at 3630 E. Imperial Hwy, Lynwood, California, asserting that the dispute was ineligible for IDR under the NSA because "the provider is a participating provider" and the claim involved "Medicare/Medicaid claims." SFMC never responded to Anthem's notice of ineligibility, nor did it withdraw the dispute.

137.   Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate Medicaid rate, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay a different amount. Because of SFMC's fraudulent attestations, Anthem was ordered to pay $1,661.15—*more than double the applicable Medicaid rate*. Anthem also paid $445 in unnecessary IDR-related fees.

**3.    *DISP-960928***

138.   The IDR proceeding captioned DISP-960928 involved emergency department services rendered at SFMC on November 16, 2023, to a member of the Cedars Sinai Health System plan, a health plan administered by ABC. SFMC billed $7,368.09 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for the services.

139.   On or about November 27, 2023, ABC issued payment of $3,428.00, which was the appropriate amount required by the Knox-Keene Act. The EOP was sent to SFMC at 3630 E. Imperial Hwy, Lynwood, CA 90262. The explanation code referenced in the claim payment does not reflect NSA eligibility. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

140.   On December 12, 2023, SFMC sent a notice of open negotiation to the Anthem IDR Email Address using the email address NSASupportTeam@primehealthcare.com. The email came from a Prime website domain, included a Prime logo, and listed Mrunmayee Waghmare, who on information

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

and belief was a PMT employee, as the point of contact for SFMC. The notice requested an additional payment of $5,894.47 to settle the claim.

Hi Team,

Please consider this email as a request for open negotiation on the below-listed account. Attached is the open negotiation request form.

| Claim ID(s): | 2023325BL0629 |
|---|---|
| Point of Contact Name: | Mrunmayee Waghmare |
| Point of Contact Phone Number: | 909-657-5850 |
| Point of Contact Email: | NSASupportTeam@primehealthcare.com |
| Desired Mailing Address for Negotiation Offer Letter to be sent to: | FederalIDR@anthem.com |
| Additional Payment Amount Requesting: | $5894.47 |

Thank You,

Prime Healthcare
Saving hospitals. Saving jobs. Saving lives.

15 TOP HEALTH SYSTEMS

141.   On December 27, 2023, Anthem responded to the notice of open negotiation, via the Anthem IDR Email Address, and indicated that "[a]fter a careful and thorough review, it has been determined that the claim submitted does not meet the Federal No Surprises Act Guidelines." This response further pointed to specific indicators—"corresponding EOB codes: AUU, AUQ, AUS, and AUW"—in the mailed remittance that show the claim was not eligible for submission under the NSA. SFMC never responded to Anthem's notification of ineligibility.

142.   Despite clear ineligibility due to the application of the Knox-Keene Act,Rather, on or about January 31, 2024, SFMC initiated IDR and falsely attested that the dispute concerned a qualified item or service within the scope of the federal IDR process.

143.   On February 5, 2024, Anthem submitted its first objection to the eligibility of the services under the NSA. As a part of Anthem's submission of an IDR Entity Selection Response Form, Anthem indicated that the dispute "includes items or services not covered under the No Surprises Act. SFMC did not respond to this notice of ineligibility, nor did it withdraw the dispute.

☑ This dispute includes items or services not covered under the No Surprises Act.

144.  In August 2024, Anthem sent two EOPs to the IDRE to demonstrate that the claim at issue was subject to a specified state law. No further action was taken by the IDRE.

145.  On December 9, 2024, Anthem submitted a second objection to eligibility to the IDRE, which was also addressed to SFMC at 3630 E. Imperial Highway, in Lynwood, California, and stated that "[t]he claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." The addendum to Anthem's letter indicated that the claim is subject to the California Surprise Billing Law. Again, SFMC never withdrew the dispute following this additional explicit notice of ineligibility.

| Addendum | | | | | | | |
|---|---|---|---|---|---|---|---|
| Claim # | Service Start Date | Service End Date | Location of Services (provider state location) | Location of Member Plan (member state location) | Member Health Plan Type | Applicable State Law | Out of Scope Reason |
| 2023325BL0629 | 11/16/2023 | 11/16/2023 | CA | CA | Fully Insured | CA | State Surprise Bill applies, |

146.  Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate rate under the Knox-Keene Act, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay a different amount. Because of SFMC's fraudulent attestations, ABC paid $5,894.47—*over $2,000 more than the payment required by the Knox-Keene Act,* which Anthem paid in the first instance. Anthem also paid $765 in unnecessary IDR-related fees.

## II. Chino Valley Medical Center

### 1.  *DISP-1145695*

147.  The IDR proceeding captioned DISP-1145695 involved emergency department services rendered at CVMC on December 20, 2023, to a member of the

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

Riverside Sheriffs Association Benefit Trust, a health plan administered by ABC. CVMC billed $4,469.24 for the services. The member's plan is subject to state law, and therefore the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for services.

148.   On or about January 5, 2024, ABC issued payment of $2,514.00, which was the appropriate amount required by the Knox-Keene Act. The EOP was sent to CVMC at Fire 1147 1801 W. Olympic, Pasadena, CA 91199. The explanation code referenced in the claim payment does not reflect NSA eligibility. The same EOP included payment information for other claims submitted by CVMC that *were* eligible for NSA dispute resolution, as indicated by specific explanation codes. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

149.   On January 31, 2024, CVMC sent a notice of open negotiation to the Anthem IDR Email Address using the email address lmontoya1@primehealthcare.com. The message which purported to be from Lulu Montoya, a Patient Account Specialist/NSA Negotiations-Collections acting on behalf CVMC. The message came from a Prime website domain and included a Prime logo. Ms. Montoya's email indicated that CVMC and Prime "expected" that the claim would be reimbursed at a rate of "80-100%" of billed charges.

150.  On February 15, 2024, Anthem responded to the notice of open negotiation, via the Anthem IDR Email Address, stating that "[a]fter a careful and thorough review, it has been determined that the claim submitted does not meet the Federal No Surprises Act Guidelines." This response further pointed to specific indicators—"corresponding EOB codes: AUU, AUQ, AUS, and AUW"—in the mailed remittance that show the claim was not eligible for submission under the NSA. CVMC never responded to Anthem's notification of ineligibility.

151.   Despite ineligibility due to the application of the Knox-Keene Act and Anthem's notice of ineligibility, on or about March 14, 2024, CVMC initiated IDR and

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

falsely attested that the dispute concerned a qualified item or service within the scope of the federal IDR process.

152.    Anthem submitted an objection to eligibility, which was also addressed to CMVC, stating that "[t]he dispute includes items or services under a coverage type not subject to the NSA." The Addendum further indicated that a "State Surprise Bill" applied to the claim. CVMC again did not respond to Anthem's notice of ineligibility, nor did it withdraw this dispute.

| Claim # | Service Start Date | Service End Date | Location of Services (provider state location) | Location of Member Plan (member state location) | Member Health Plan Type | Applicable State Law | Out of Scope Reason |
|---|---|---|---|---|---|---|---|
| 2023361EE7313 | 12/20/2023 | 12/20/2023 | CA | CA | Fully Insured | CA | State Surprise Bill applies, |

153.    Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate rate under the Knox-Keene Act, the IDRE nevertheless proceeded to a final payment determination and ordered ABC to pay a different amount. Because of CVMC's fraudulent attestations, ABC paid $3,575.39—*over $1,000 more than the payment required by the Knox-Keene Act*, which ABC paid in the first instance. Anthem also paid $765 in unnecessary IDR-related fees.

### 2.    *DISP-735455*

154.    The IDR proceeding captioned DISP-735455 involved emergency department services rendered at CVMC on August 14, 2023, to a member of the PRISM plan, a fully insured health plan administered by ABC. CVMC billed $6,314.87 for the services. The member's plan is subject to state law, and therefore the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for the services.

155.    On or about August 25, 2023, ABC issued payment of $3,578.00, which was the appropriate amount required by the Knox-Keene Act. The EOP was sent to CVMC at 5451 Walnut Ave., Chino, CA 91710. The explanation code referenced in the claim payment does not reflect NSA eligibility. The same EOP included payment

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

information for other claims submitted by CVMC that *were* eligible for NSA dispute resolution, as indicated by specific explanation codes. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

156.    On September 25, 2023, CVMC sent a notice of open negotiation to the Anthem IDR Email Address, using the email address NSASupportTeam@primehealthcare.com. The email came from a Prime website domain and included a Prime logo. The Open Negotiation request listed Aehsan Sheikh, a PMT employee, as the point of contact and requested additional payment in the amount of $5,051.90.

157.    On November 10, 2023, Anthem responded to the notice of open negotiation, via the Anthem IDR Email Address, and indicated that "[a]fter a careful and thorough review, it has been determined that the claim submitted does not meet the Federal No Surprises Act Guidelines." This response further pointed to specific indicators—"corresponding EOB codes: AUU, AUQ, AUS, and AUW"—in the mailed remittance that show the claim was not eligible for submission under the NSA. CVMC never responded to Anthem's email notification of ineligibility.

158.    Despite clear ineligibility due to the application of the Knox-Keene Act, on or about August 15, 2024, CVMC initiated IDR and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process.

159.    Anthem submitted an objection to eligibility to the IDRE, which was also addressed to CVMC, stating that "[t]he services do not qualify for surprise billing protection under the NSA." The Addendum further indicated that a state surprise bill applied to the claim. CVMC again did not respond to Anthem's notice of ineligibility, nor did it withdraw the dispute.

160.    Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate rate under the Knox-Keene Act, the IDRE nevertheless proceeded to a final payment determination and ordered ABC to pay a different amount. Because of

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

CVMC's fraudulent attestations, ABC paid $4,951.90— *over $1,000 more than the payment required by the Knox-Keene Act*, which ABC paid in the first instance. Anthem also paid $445 in unnecessary IDR-related fees.

### 3.    *DISP-2041762*

161.    The IDR proceeding captioned DISP-2041762 involved emergency department services rendered at CVMC on April 9, 2022, to a member of the China Mobile International USA Inc. plan, a fully insured health plan administered by ABC. CVMC billed $2,634.60 for the services. The member's plan is subject to state law, and therefore the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for the services. CVMC also violated the statutory IDR filing deadline, making the dispute ineligible for an additional reason.

162.    On or about May 6, 2022, ABC issued payment as required by the Knox-Keene Act and sent a corresponding EOP to CVMC at 5451 Walnut Ave, Chino, CA 91710. The explanation code referenced in the claim payment does not reflect NSA eligibility. The same EOP included payment information for other claims submitted by CVMC that *were* eligible for NSA dispute resolution, as indicated by specific explanation codes. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

163.    CVMC did not initiate the open negotiation period within 30 business days of claim payment, as the NSA requires. Nor did CVMC initiate open negotiations at all. Rather, on or about November 6, 2024—more than two years after ABC issued payment—IDR was *untimely* initiated on behalf of CVMC. CVMC falsely attested that the service was a qualified item or service within the scope of the federal IDR process and that CVMC had complied with the necessary prerequisites to IDR—including exhaustion of required open negotiations.

164.    Anthem submitted an objection to eligibility, which was also sent to CVMC at 5451 Walnut Avenue in Chino California, stating both that "[t]he non-

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

participating provider/facility failed to engage in the 30-business day open negotiation period" and that "[t]he dispute includes items or services under a coverage type not subject to the NSA." The Addendum further indicated that California State law applied to the claim. CVMC did not withdraw the dispute following Anthem's notice of ineligibility.

☑ The non-participating provider/facility failed to engage in the 30-business day open negotiation period, according to the NSA. Providers cannot pursue IDR unless and until the open negotiation period is properly initiated and completed. Per CMS regulations, providers must submit open negotiation notices to the contact information set forth in their initial payment or denial of payment. [Insert HealthPlan] accepts open negotiation notices through the following: Availity, Mail to a specified address, Fax to a specified number, Email to a specified address Via phone to a specified number

☑ The dispute includes items or services under a coverage type not subject to the NSA.

165. Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate rate under the Knox-Keene Act, the IDRE nevertheless provided to a final payment determination and ordered Anthem to pay a different amount. Because of CVMC's fraudulent attestations, ABC paid $2,030.68. Anthem also paid $510 in unnecessary IDR-related fees.

## III.    Encino Hospital Medical Center

### 1.    *DISP-960940*

166. The IDR proceeding captioned DISP-960940 involved emergency department services rendered at EHMC on October 9, 2023, to a member of a fully insured health plan administered by ABC. EHMC billed $6,555.68 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for services.

167. On or about November 10, 2023, ABC allowed $3,165.08 to be paid on the claim, issuing a payment to EHMC in the amount of $1,436.31 and assigning the balance to the member's cost share, which was the appropriate amount required by the Knox-Keene Act. The EOP was sent to Prime at 16237 Ventura Blvd., Encino, CA 91436-2201. The explanation code referenced in the claim payment does not reflect

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

NSA eligibility. The same EOP included payment information for other claims submitted by EHMC that *were* eligible for NSA dispute resolution, as indicated by specific explanation codes. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

168. EHMC did not initiate the open negotiation period within 30 business days of claim payment, as the NSA requires. Nor did EHMC initiate open negotiations at all. Rather, on or about January 31, 2024, IDR was *untimely* initiated on behalf of EHMC. EHMC falsely attested that the service was a qualified IDR item or service within the scope of the federal IDR process and that EHMC had complied with the necessary prerequisites to IDR—including exhaustion of open negotiations.

169. Following this IDR initiation, ABC submitted an objection to eligibility to the IDRE, which was also sent to Prime at 16237 Ventura Blvd., Encino, CA 91436-2201, stating that the dispute was ineligible for IDR due to (1) EHMC's failure to initiate open negotiations; and (2) the dispute included "items or services under a coverage type not subject to the NSA." Moreover, the addendum also stated that the plan was subject to the state surprise billing law. EHMC did not respond to ABC's notice of ineligibility, nor did it withdraw the dispute.

170. Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination. Because of EHMC's fraudulent attestations, ABC was ordered to pay $5,244,54—*over $2,000 more than the payment required by the Knox-Keene Act*, which was paid in the first instance. ABC also paid $765 in unnecessary IDR-related fees.

## 2. *DISP-781499*

171. The IDR proceeding captioned DISP-781499 involved emergency department services rendered at EHMC on February 1, 2023, to a member of the Goodkin Law Group APC plan, a fully insured health plan administered by ABC. EHMC billed $18,141.34 for the services.

172.  On or about February 10, 2023, ABC issued payment of $4,480.88 and sent the EOP to EHMC at P.O. Box 1152, Pasadena, CA 91199-0001.

173.  On October 18, 2023, Prime sent a spreadsheet with around 180 open negotiation requests to the Anthem IDR Email Address using the email address NSASupportTeam@primehealthcare.com stating that it had previously submitted a notice of open negotiation, at some point between the period of September 18, 2023 and October 13, 2023—*well after the open negotiation period had ended*. Prime's email stated that it submitted the open negotiation request originally through the Prime Portal, indicating that Prime might be aware of potential issues with opening the secure email by stating, "none of the secure emails were read from your side. Kindly let us know if you are facing any difficulties to open our secure emails." The email purported to be from Dev Shah, Senior Associate – NSA, acting on behalf EHMC. The message came from a Prime website domain and included a Prime logo.

174.  Despite failure to timely initiate open negotiations, on or about September 25, 2024, EHMC *untimely* initiated IDR and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process. ABC submitted an objection to eligibility to the IDRE, which was also addressed to EHMC, stating that the dispute was ineligible for IDR, in part, because the provider failed to initiate open negotiations. EHMC again did not respond to ABC's notice of ineligibility, nor did it withdraw the dispute.

175.  Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered ABC to pay EHMC. Because of EHMC's fraudulent attestations, ABC was required to pay $14,513.07.

## IV.    Garden Grove Hospital & Medical Center

### 1.    *DISP-2895868*

176.  The IDR proceeding captioned DISP-2895868 involved emergency department services rendered at GGHMC on January 13, 2025 to a member of a fully

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

insured health plan administered by ABC. GGHMC billed $3,729.19 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for services.

177. On or about January 24, 2025, ABC issued payment as required by the Knox-Keene Act and sent a corresponding EOP to GGHMC at File 1199 1801 W. Olympic, Pasadena, CA 91199. The explanation code referenced in the claim payment does not reflect NSA eligibility. The same EOP included payment information for other claims submitted by GGHMC that *were* eligible for NSA dispute resolution, as indicated by specific explanation codes. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

178. On February 5, 2025, GGHMC sent a notice of open negotiation the Anthem IDR Email Address using the email address NSASupportTeam@primehealthcare.com. The email purported to be from Aehsan Sheikh acting on behalf GGHMC. The message came from a Prime website domain and included a Prime logo.

179. On February 7, 2025, ABC responded to the notice of open negotiation, by sending a letter addressed to Aehsan Sheikh at File 1199 1801 W. Olympic Blvd., Pasadena, CA 91199, stating that the claim was not governed by the NSA. GGHMC never responded to ABC's notification of ineligibility.

180. Despite clear ineligibility due to the application of the Knox-Keene Act, at some point prior to April 7, 2025, GGHMC initiated IDR and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process. ABC submitted an objection to eligibility to the IDRE, which was also addressed to GGHMC, stating that the services were subject to a state surprise billing law and therefore ineligible for IDR. GGHMC again did not respond to ABC's notice of ineligibility, nor did it withdraw the dispute.

181. Despite the fact that the dispute was ineligible for IDR and already paid at

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

the appropriate rate under the Knox-Keene Act, the IDRE nevertheless proceeded to a final payment determination and ordered ABC to pay a different amount. Because of GGHMC's fraudulent attestations, ABC was required to pay $2,983.35. ABC also paid $613 in unnecessary IDR-related fees.

**2.    *DISP-2272097***

182.    The IDR proceeding captioned DISP-2272097 involved emergency department services rendered at GGHMC on October 3, 2022, to a member of a fully insured health plan administered by ABC. GGHMC billed $6,752.83 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for services.

183.    On or about June 30, 2023, ABC sent GGHMC an EOP stating that the claim was processed pursuant to explanation codes "033" and "29," which denied payment due to untimely filing of the claim. The EOP also indicated that appeals could be made to California's DMHC, showing that the plan was state regulated and therefore subject to the Knox-Keene Act.

184.    On October 30, 2024, more than a year after Anthem's EOP, GGHMC sent a notice of open negotiation to the Anthem IDR Email Address using the email address NSASupportTeam@primehealthcare.com. The email purported to be from Harika Kadari acting on behalf GGHMC. The message came from a Prime website domain and included a Prime logo.

185.    On November 5, 2024, ABC responded to the notice of open negotiation, via a letter addressed to GGHMC, stating that the dispute was ineligible for IDR because the claim was not governed under the NSA. GGHMC never responded to ABC's notification of ineligibility.

186.    Despite clear ineligibility, including the application of the Knox-Keene Act, on or about December 17, 2024, GGHMC initiated IDR and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process. ABC submitted an objection to eligibility to the IDRE, which was also

addressed to GGHMC, stating that the dispute was ineligible for IDR, in part, because (1) GGHMC's notice of open negotiation was untimely; (2) the dispute included "items or services not covered by the member's insurance policy"; and (3) the dispute included "items or services under a coverage type not subject to the NSA." GGHMC again did not respond to ABC's notice of ineligibility, nor did it withdraw the dispute.

187.  Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered ABC to pay GGHMC. Because of GGHMC's fraudulent attestations, ABC was required to pay $5,402.26—an amount equal to 80% of GGHMC's billed charge.

## V.  Huntington Beach Hospital

### 1.   *DISP-714973*

188.  The IDR proceeding captioned DISP-714973 involved services rendered at HBH on August 2, 2023, to a member of a fully insured health plan administered by ABC. HBH billed $14,929.70 for the services.

189.  On or about August 25, 2023, ABC issued payment of $8,241.19 and sent the EOP to HBH at 17772 Beach Blvd., Huntington Beach, CA 92647-6819.

190.  HBH did not initiate the open negotiation period within 30 business days of claim payment, as the NSA requires. Nor did HBH initiate open negotiations at all. Rather, on or about September 20, 2024, IDR was initiated on behalf of HBH. HBH falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process for which HBH had exhausted open negotiations.

191.  On or about September 20, 2024, HBH initiated IDR and falsely attested that the service was a qualified IDR item or service within the scope of the federal IDR process and that HBH had complied with the requirements of the NSA in submitting the claim.

192.  On October 4, 2024, in coordination with the submission of a timely offer to the IDRE, ABC submitted an objection to eligibility, which was also sent to HBH at 17772 Beach Blvd, Huntington Beach, CA 92647-6819, the dispute was ineligible for

IDR due to HBH's failure to initiate open negotiations. HBH never responded to ABC's assertion of ineligibility, and, significantly, never withdrew the dispute.

193.    Nevertheless, because of HBH's fraudulent attestations, ABC was ordered to pay $11,942.96. Anthem also paid $624.71 in unnecessary IDR-related fees.

## VI.    La Palma Intercommunity Hospital

### 1.    *DISP-1527448*

194.    The IDR proceeding captioned DISP-1527448 involved services rendered at LPIH to a member of the Los Angeles Police Relief Association Inc. plan, a health plan administered by ABC. LPIH billed $22,239.22 for this service.

195.    On or about September 22, 2023, ABC issued payment of $12,173.75. The EOP was sent to LPIH at 7901 Walker St, La Palma, CA 90623.

196.    LPIH did not initiate the open negotiation period within 30 business days of claim payment, as the NSA requires. Nor did LPIH initiate open negotiations at all. Rather, on or about July 6, 2024—over nine months after ABC issued payment—IDR was *untimely* initiated on behalf of LPIH. LPIH falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process for which LPIH had exhausted open negotiations.

197.    On July 16, 2024, Anthem submitted an objection to eligibility to the IDRE, but the IDRE did not respond. On October 10, 2024, Anthem submitted another objection to eligibility to the IDRE, which was also addressed to LPIH at 7901 Walker St., La Palma, California 90623-1722. In the letter, Anthem indicated that the claim was ineligible for IDR under the NSA, because, in relevant part, LPIH failed to initiate open negotiations.

198.    Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay $17,791.38, an amount equal to 80% of LPIH's billed charges. Anthem also paid $765 in unnecessary IDR-related fees.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

## 2. *DISP-2336057*

199. The IDR proceeding captioned DISP-2336057 involved emergency department services rendered at LPIH to a member of the Hydraflow plan, a health plan administered by ABC. LIPH billed $6,367.45 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for this service.

200. On or about May 6, 2022, ABC sent an EOP to LPIH at File 1080 1801 W Olympic Pasadena, CA, denying payment due to LPIH's failure to submit the claim to the appropriate payor. Putting this issue aside, the EOP indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

201. Despite clear ineligibility due to the application of the Knox-Keene Act, on or about December 30, 2024, LPIH initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The Notice of IDR Initiation was signed by Rithisha Battu. The Notice of IDR lists idrappeals@primehealthcare.com as the applicable email address.

202. Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay a different amount. Because of Prime and LIPH's fraudulent attestations, ABC paid $5,093.96—an amount equal to 80% of LPIH's billed charge—when no payment was owed in the first place and, in any event, the Knox-Keene Act clearly applied.

## VII. Montclair Hospital Medical Center

### 1. *DISP-1531929*

203. The IDR proceeding captioned DISP-1531929 involved services rendered at MHMC to a member of a plan administered by ABC. MHMC billed $4,434.13 for the services.

204. On or about May 7, 2024, ABC issued payment and sent the EOP to MHMC at 5000 San Bernardino St, Montclair, CA 91763.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

205.   MHMC did not initiate the open negotiation period within 30 business days of claim payment, as the NSA requires. Nor did MHMC initiate open negotiations at all. Rather, on or about July 17, 2024, MHMC initiated IDR and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process for which MHMC had exhausted open negotiations.

206.   Anthem submitted an objection to eligibility to the IDRE, which was also addressed to MHMC at 5000 San Bernardino St, Montclair, CA 91763, asserting that the claim was ineligible for IDR under the NSA because the provider failed to initiate open negotiations.

207.   Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay $3,905.88.

**2.    *DISP-2241469***

208.   The IDR proceeding captioned DISP-2241469 involved services rendered at MHMC to a member of a health plan administered by ABC. MHMC billed $94,833.33 for this service.

209.    On or about October 18, 2024, ABC sent an EOP to MHMC at 5000 San Bernadino St, Montclair, CA 91763, denying payment pursuant to explanation code "ABN", which is used when a member is in a "3 month 'grace period'" and is required to pay healthcare premiums.

210.   MHMC did not initiate the open negotiation period within 30 business days of claim adjudication, as the NSA requires. Nor did MHMC initiate open negotiations at all. Rather, on or about December 16, 2024, MHMC initiated IDR and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process for which MHMC had exhausted open negotiations.

211.   Anthem promptly submitted an objection to eligibility to the IDRE, asserting that the claim was ineligible for IDR under the NSA. On February 3, 2025, Anthem submitted another objection to eligibility to the IDRE and to MHMC at 5000

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

San Bernadino St, Montclair, CA 91763, indicating that the claim was ineligible for IDR under the NSA, because (1) the provider had not complied with the 30-business day open negotiation period requirements, and (2) "[t]he services do not qualify for surprise billing protection under the NSA." MHMC did not respond to Anthem's notice of ineligibility, nor did it withdraw the dispute.

212. Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay $66,920.67 when no payment was owed in the first place and, in any event, the provider failed to exhaust pre-IDR open negotiations. Anthem also paid $765 in unnecessary IDR-related fees.

## VIII. Paradise Valley Hospital

### 1. *DISP-1388066*

213. The IDR proceeding captioned DISP-1388066 involved emergency services rendered at PVH on March 4, 2023, to a member of the Stones South Bay Corp. plan, a fully insured health plan administered by ABC. PVH billed $1,801.85 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for services.

214. On or about March 17, 2023, Anthem sent an EOP to PVH at File 1145, 1801 West Olympic Blvd, Pasadena, California, denying payment due to PVH's failure to submit the claim to the appropriate payor. Putting this issue aside, the EOP indicated that appeals could be made to California's DMHC, showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

| 857 | This claim was denied. The services are the responsibility of the member's Primary Medical Group (PMG). For the quickest and easiest way to check a member's benefits, from Availity.com use the Patient Registration tab to access Eligibility and Benefits Inquiry. |

215. Despite clear ineligibility due to the application of the Knox-Kenne Act, on or about May 29, 2024, PVH initiated IDR and falsely attested that the dispute concerned a qualified item or service within the scope of the federal IDR process.

216.    Anthem submitted an objection to eligibility to the IDRE, which was also addressed to PVH at 1801 West Olympic Blvd File 1145 Pasadena, California, which indicated that the claim was ineligible for IDR under the NSA, because, in relevant part, the services were not covered and were not subject to the NSA. PVH did not respond to Anthem's clear notice of ineligibility, nor did it withdraw the dispute.

217.    Despite the fact that the dispute was ineligible for IDR the IDRE nevertheless proceeded to a final payment determination and ordered ABC to pay $2,048.04 when no payment was owed in the first place and, in any event, the Knox-Keene Act clearly applied.

## IX.    Shasta Regional Medical Center

### 1.  DISP-249341

218.    The IDR proceeding captioned DISP-2459341 involved emergency department services rendered at SRMC to a member of the Operating Engineers Local 3 H&W Trust Fund plan, a health plan administered by Anthem. Shasta billed $8,357.70 for the services.

219.    On or about July 29, 2022, Anthem sent an EOP to SRMC at PO Box 749229, Los Angeles, CA, denying payment because the benefits were provided by another insurance carrier and the services were not covered by Anthem.

220.    On January 9, 2025, more than two years after receipt of the initial EOP and well outside the requisite open negotiation time frame, Prime sent a notice of open negotiation to Anthem to initiate the federal IDR process for all services. The notice of open negotiation was signed by Aehsan Sheikh as a "Hospital Representative," and sent by the email address, NSASupportTeam@primehealthcare.com. On January 7, 2025, Anthem sent its response to the notice of open negotiation to SRMC, with attention to Aehsan Sheikh, at PO Box 749229, Los Angeles, CA, noting that the request for negotiation could not be processed because the provider did not send in the negotiation claim payment dispute timely per federal mandated guidelines.

221.    Despite clear ineligibility, SRMC initiated IDR on or about January 24,

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

2025, and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay $6,686.16 when no payment was owed in the first place.

## X. Sherman Oaks Hospital

### 1. *DISP-1207866*

222.    The IDR proceeding captioned DISP-1207866 involved emergency department services rendered at SOH to a member of the Chandler Treatment LLC plan, a health plan administered by ABC. SOH billed $7,929.44 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for this service.

223.    On or about March 24, 2023, ABC issued payment of $2,493.40 which was the appropriate amount required by the Knox-Keene Act. The EOP was sent to SOH at File 1026, 1801 W Olympic Blvd, Pasadena, CA. The claim payment did not reflect NSA eligibility. The same EOP included payment information for other claims submitted by SOH that *were* eligible for NSA dispute resolution, as indicated by specific explanation codes. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

224.    Despite clear ineligibility due to the application of the Knox-Keene Act, on or about April 5, 2024, SOH initiated IDR and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process. Anthem submitted an objection to eligibility to the IDRE, which was also addressed to SOH at 4929 Van Nuys Blvd, Sherman Oaks, CA 91403, stating in part that the dispute was ineligible for IDR "because a state surprise billing law applies." SOH did not respond to Anthem's notice, nor did it withdraw the dispute.

225.    Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate rate under the Knox-Keene Act, the IDRE nevertheless proceeded to a

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

final payment determination and ordered Anthem to pay a different amount. Because of SOH's fraudulent attestation, ABC was ordered to pay $6,343.55— *more than double the payment required by the Knox-Keene Act,* which Anthem paid in the first instance.

### 2.   *DISP-2268604*

226.   The IDR proceeding captioned DISP-2268604 involved emergency department services rendered at SOH to a member of a fully insured plan administered ABC. SOH billed $2,991.85 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for the services.

227.   On or about April 7, 2023, sent an EOP to SOH at File 1026, 1801 W Olympic Blvd, Pasadena, CA, denying payment due to SOH's failure to submit the claim to the appropriate payor. Putting this issue aside, the EOP indicated that appeals could be made to California's DMHC, showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

228.   On October 29, 2024, more than one year after receipt of the EOP and well outside the requisite open negotiation time frame, Prime sent a notice of open negotiation to Anthem to initiate the federal IDR process for the services. The notice of open negotiation was signed by Aehsan Sheikh as a "Hospital Representative," and sent by the email address NSASupportTeam@primehealthcare.com. On November 5, 2024, Anthem sent its response to the notice of open negotiation to SOH, with attention to Aehsan Sheikh, at 4929 Van Nuys Boulevard, Sherman Oaks, CA 91403, noting that the request for negotiation could not be processed because the claim is not governed by the Federal No Surprises Act.

229.   Despite clear ineligibility due to the application of the Knox-Keene Act, on or about December 17, 2024, SOH initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. Anthem submitted an objection to eligibility to the IDRE, which was also addressed to SOH at File1026 1801 W Olympic Blvd, Pasadena, CA, stating that the services were out of the

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

scope of the NSA and therefore ineligible for IDR. SOH did not respond to ABC's notice of ineligibility, nor did it withdraw the dispute.

230.   Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate rate under the Knox-Keene Act, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay a different amount. Because of SOH's fraudulent attestations, ABC paid $2,043.48, when no payment was owed in the first place and, in any event, the Knox-Keene Act clearly applied.

## XI.    West Anaheim Medical Center

### 1.    *DISP-1946957*

231.   The IDR proceeding captioned DISP-1946957 involved services rendered at WAMC to a member of a fully insured health plan administered by ABC. WAMC billed $24,605.33 for this service.

232.   On or about November 3, 2023, ABC issued payment of $10,462.19. The EOP, sent to WAMC at 1801 W Olympic Blvd File 1090, Pasadena, CA.

233.   WAMC did not initiate the open negotiation period within 30 business days of claim adjudication, as the NSA requires. Rather, on or about September 5, 2024—over ten months after the EOP—WAMC *untimely* initiated open negotiations. Then, on or about October 19, 2024, WAMC initiated IDR and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process for which WAMC had exhausted open negotiations.

234.   Anthem submitted an objection to eligibility to the IDRE, which was also addressed to WAMC at File 1092 1801 W Olympic Pasadena, CA, stating that the claim was ineligible for IDR under the NSA, because the provider had not complied with the 30-business day open negotiation period requirements. WAMC did not respond to ABC's notice of ineligibility, nor did it withdraw the dispute.

235.   Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay $19,684.26, in addition to $505 in unnecessary IDR-related fees.

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

### 2. DISP-590332

236. The IDR proceeding captioned DISP-590332 involved emergency department services rendered at WAMC to a member of the Sheets Contracting Inc. plan, a health plan administered by ABC. WAMC billed $5,721.16 for this service. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for the services.

237. On or about June 23, 2023, ABC issued payment of $1,406.60, which was the appropriate amount required by the Knox-Keene Act. The EOP was sent to WAMC at 1801 W Olympic Blvd File 1090, Pasadena, CA. The claim payment does not reflect NSA eligibility. The same EOP included payment information for other claims submitted by WAMC that were eligible for NSA dispute resolution, as indicated by specific explanation codes. The EOP also indicated that appeals could be made to California's DMHC, further showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

238. Despite clear ineligibility due to the application of the Knox-Keene Act, on or about October 25, 2024, WAMC initiated IDR, and falsely attested that the dispute concerned a qualified IDR item or service within the scope of the federal IDR process. Anthem submitted an objection to eligibility to the IDRE, which was also addressed to WAMC at 1801 W Olympic Blvd File 1090, Pasadena, CA, stating that the services were subject to a state surprise billing law and therefore ineligible for IDR. WAMC did not respond to Anthem's notice of ineligibility, nor did it withdraw the dispute.

239. Despite the fact that the dispute was ineligible for IDR and already paid at the appropriate rate under the Knox-Keene Act, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay a different amount. Because of the WAMC's fraudulent attestations, ABC paid $4,150.08, in addition to $445 in unnecessary IDR-related fees.

### 3. DISP-2539473

240. The IDR proceeding captioned DISP-2539473 involved emergency

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

services rendered at WAMC to a member of a plan insured by ABC. WAMC billed $2,830.01 for the services. The member's plan is subject to state law, and therefore, the Knox-Keene Act—rather than the NSA—governed the reimbursement rate for the services.

241.    On or about September 16, 2022, ABC sent an EOP to WAMC at 1801 W Olympic Blvd File 1090, Pasadena, CA, denying payment due to WAMC's failure to submit the claim to the appropriate payor. Putting this issue aside, the EOP indicated that appeals could be made to California's DMHC, showing that the plan was state-regulated and therefore subject to the Knox-Keene Act.

242.    On December 21, 2024, more than two years after receipt of the initial remittance advice and well outside the requisite open negotiation time frame, Prime sent a notice of open negotiation to Anthem to initiate the federal IDR process for the services. The notice of open negotiation was signed by Aehsan Sheikh as a "Hospital Representative," and sent by NSASupportTeam@primehealthcare.com. On December 29, 2024, Anthem sent its response to the notice of open negotiation to WAMC, with attention to Aehsan Sheikh, at File 1092 1801 W Olympic, Pasadena, CA 91199-0001, noting that the request for negotiation could not be processed because the claim is not governed by the Federal No Surprises Act.

243.    Despite clear ineligibility due to the application of the Knox-Keene Act, on or about February 6, 2025, Prime, in coordination with and on behalf of WAMC, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Aniket Pawar. The email address listed in the IDR initiation form was idrappeals@primehealth.com.

244.    Anthem submitted an objection to eligibility to the IDRE, which was also addressed to West Anaheim at 1801 W Olympic Blvd File 1090, Pasadena, CA, stating that the dispute was ineligible due to (1) the provider's failure to initiate timely negotiations, (2) the services not being covered, and (3) the services not being subject

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

to the NSA. WAMC did not respond to ABC's notice of ineligibility, nor did it withdraw the dispute.

245.    Despite the fact that the dispute was ineligible for IDR, the IDRE nevertheless proceeded to a final payment determination and ordered Anthem to pay a different amount. Because of these fraudulent attestations, ABC paid $2,264.01 when no payment was owed in the first place and, in any event, the Knox-Keene Act clearly applied.

### CLAIMS FOR RELIEF

### COUNT I

### BUSINESS ACTS OR PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 et seq.

246.    Anthem repeats and realleges the allegations in Paragraphs 1 through 245 contained in the Complaint as if fully set forth at length herein.

247.    Defendants engaged in unlawful, unfair, and fraudulent business acts or practices by misrepresenting information to Anthem, the IDREs, and the Departments throughout the NSA dispute resolution process, including by submitting the false attestations of eligibility regarding the disputes to Anthem, the IDREs, and the Departments. Since January 4, 2024, Defendants submitted thousands of ineligible disputes through the NSA dispute resolution process, including in the exemplar disputes identified above, in which they knowingly, recklessly, and unfairly represented that the disputes were eligible through IDR when they knew they were not.

248.    From Anthem members' insurance cards, Anthem's EOPs, the plain text of federal laws and regulations, CMS publications and resources, Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, their own contracts with Anthem, and the specific objections to eligibility that Anthem submitted to Defendants, among other sources, the Defendants knew that the services and disputes they were initiating were ineligible for the IDR process.

249.    Defendants submitted these false attestations and did so with the intent that

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

Anthem, the IDREs, and the Departments rely on them. Anthem was, in fact, compelled to rely on the false attestations because it was forced to proceed to a payment determination, despite each dispute's ineligibility.

250. Through their scheme of knowingly and recklessly submitting false attestations of eligibility to Anthem, the IDREs, and the Departments when initiating IDR, and additionally, by misrepresenting to Anthem during open negotiations that disputes were eligible when they knew they were not, Defendants violated the following statutes:

- California Penal Code § 550, which makes it unlawful to knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim; conspire to or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact; or conspire to prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact, among other things.

- The Federal Health Care Fraud Statute, as set forth in 18 U.S.C. Section 1347, which prohibits individuals and entities from executing or attempting to execute a scheme to defraud a health care benefit program, whether or not it is a federal program.

- The NSA, 29 U.S.C. § 1185e and 42 U.S.C. § 300gg-111, and its implementing regulations, 29 C.F.R. § 2590.716-8 and 45 C.F.R. § 149.510, including by: (1) giving legally insufficient notice of Open Negotiation and IDR through the Portal, which was designed to deprive Anthem of the ability to respond to ineligible disputes; (2) submitting false attestations that items and services under dispute are qualified IDR items and services; (3) initiating the IDR process for items and services that are not qualified IDR items and services; and (4) procuring IDR determinations and payment for items and services that are not qualified IDR items and services, as alleged herein.

CROWELL & MORING LLP

A limited liability partnership formed in the District of Columbia

251.    In addition to being unlawful, the conduct by Defendants, described herein, is unfair in that it is immoral, unethical, oppressive, and unscrupulous. Moreover, through the significant financial harm this conduct causes to Anthem and its affiliated plans, it also disrupts the insurance market and causes significant downstream harm to consumers through the increased cost of health care services.

252.    Defendants' conduct, as described herein, is fraudulent, as Defendants submitted thousands of knowingly false attestations of eligibility to Anthem, the IDREs, and the Departments, on which Anthem and the IDREs justifiably relied, as Defendants intended, resulting in Anthem suffering millions of dollars in damages in the form of payments on ineligible IDR determinations and payment of required IDRE fees and non-refundable administrative fees.

253.    As a result of these unlawful, unfair, and fraudulent practices, Anthem and its affiliated health plans have suffered substantial damages.

## COUNT II

## VACATUR OF IDR DETERMINATIONS

### (Brought in the Alternative)

254.    Anthem repeats and realleges the allegations in Paragraphs 1 through 245 contained in the Complaint as if fully set forth at length herein.

255.    In the alternative to seeking relief on the aforementioned counts, Anthem seeks vacatur of individual IDR determinations under 42 U.S.C. § 300gg-111(c)(5)(E).

256.    Each individual IDR determination at issue was procured by undue means and fraud, warranting vacatur pursuant to 42 U.S.C. § 300gg-111(c)(5)(E) and 9 U.S.C. § 10(a)(1).

257.    For each individual IDR determination at issue, the IDREs exceeded their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process. This warrants vacatur pursuant to 42 U.S.C. § 300gg-111(c)(5)(E) and 9 U.S.C. § 10(a)(4).

258.    Defendants continue to obtain awards by undue means and fraud, and the

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

IDREs continue to exceed their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process. Thus, the number of IDR payment determinations subject to vacatur is expected to increase during the pendency of the case.

## COUNT III

## ERISA CLAIM FOR EQUITABLE RELIEF

259.    Anthem repeats and realleges the allegations in Paragraphs 1 through 245 contained in this Complaint as if fully set forth at length herein.

260.    Anthem provides claims administration services for certain health benefit plans governed by ERISA. Those health benefit plans and their employer sponsors delegate to Anthem discretionary authority to recover overpayments, including those resulting from fraud, waste, or abuse. They also delegate the authority to Anthem to administer the IDR process for the plans, including the discretionary authority to perform other services incident or necessary to Anthem's administration of the IDR process.

261.    ERISA authorizes a fiduciary of a health plan to bring a civil action to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

262.    Anthem is an ERISA fiduciary, as defined in 29 U.S.C. § 1104, its ERISA-regulated plans that were affected by Defendants' illegal conduct. Each of these plans, in form and in substance, gives Anthem the right to recover on illegal payments for the plan.

263.    Section 1185e of ERISA sets out the rights and obligations of plans and medical providers with respect to the IDR process, including that the IDR process does not apply in situations where there is a specified state law, where the provider is a participating provider, and where the provider has not initiated or engaged in open

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

negotiations. 29 U.S.C. § 1185e.

264.   Through the acts described herein, Defendants have caused and continue to cause the overpayment of funds on behalf of ERISA-governed benefit plans through conduct that violates Section 1185e of ERISA.

265.   Defendants are continuing to engage in such improper conduct, including but not limited to failing to properly initiate or engage in open negotiations prior to initiating the IDR process, initiating IDR for services subject to California's specified state law, initiating IDR with respect to claims that Anthem denied and thus are exempt from the IDR process, and failing to comply with other NSA requirements such as the IDR batching rules or the cooling off period. This conduct causes ongoing harm to Anthem and the ERISA-governed benefit plans.

266.   There is an actual case and controversy between Anthem and Defendants relating to the claims fraudulently submitted and disputed as part of the NSA's IDR process.

267.   Anthem seeks an order enjoining Defendants from:

   a. Initiating IDR without first properly initiating and engaging in open negotiations;

   b. Initiating IDR for services subject to California's specified state laws;

   c. Initiating IDR for services that Anthem denied and thus are not eligible for IDR; and

   d. Initiating IDR for services when Defendants failed to comply with other NSA requirements such as the deadline to initiate IDR following open negotiations.

## COUNT IV

## DECLARATORY AND INJUNCTIVE RELIEF

268.   Anthem repeats and realleges the allegations in Paragraphs 1 through 245 contained in this Complaint as if fully set forth at length herein.

269.   Anthem seeks a declaration that the Defendants' conduct of submitting false attestations and initiating IDR for disputes not eligible for the IDR process, and

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

each Defendant's conduct causing the same, is unlawful. Anthem additionally seeks a declaration that IDR determinations for such unqualified IDR items or services are not binding or subject to payment. It further seeks an injunction prohibiting Defendants from continuing to submit false attestations and initiate IDR for items or services that are not qualified for IDR, or from seeking to enforce non-binding IDR determinations entered on items and services not qualified for IDR.

270.　With respect to health plans and claims governed by ERISA, this cause of action is alleged in the alternative to the previous cause of action, in the event that the Court determines that relief under Section 1132(a)(3) of ERISA is not available.

271.　There is no adequate remedy at law to prevent the ongoing harm caused by Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, Anthem respectfully requests that the Court:

a. Award monetary damages to the full extent allowed by law, including, but not limited to, compensatory damages, punitive damages, and treble damages;

b. Award relief from all improperly obtained NSA IDR awards;

c. Award declaratory relief in the form of an order finding that Defendants' conduct in submitting false attestations and initiating IDR for unqualified IDR items or services is unlawful;

d. Award declaratory relief in the form of an order finding that IDR awards for such unqualified IDR items or services are not binding;

e. Award injunctive relief prohibiting Defendants from continuing to submit false attestations and from continuing to initiate IDR for items or services that are not qualified for IDR, or from seeking to

COMPLAINT AND DEMAND FOR JURY TRIAL

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia

enforce non-binding awards entered on items and services not qualified for IDR;

f.  Award equitable relief in the form of restitution, surcharge, and/or disgorgement;

g.  Declare that IDR awards issued on unqualified IDR items or services are non-binding and are not payable on a go-forward basis;

h.  Award pre- and post-judgment interest;

i.  Award costs, attorney's fees, and interest;

j.  In the alternative, grant vacatur of the underlying IDR determinations; and

k.  Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Anthem demands a trial by jury on all issues so triable.

Dated:  January 5, 2026                     CROWELL & MORING LLP


By: */s/ Laura Schwartz*
    Laura Schwartz
    Attorneys for Plaintiffs

CROWELL & MORING LLP
A limited liability partnership formed in the District of Columbia